**1106**

Jeris A. DANIELSON, State Engineer, and Alan D. Berryman, Division Engineer for Water Division No. 1, Objector–Appellant,

v.

CASTLE MEADOWS, INC., Applicant–Appellee,

and

Mission Viejo Company, Highlands Ranch Development Corporation, and Centennial Water and Sanitation District, Objectors–Appellees.

No. 89SA64.

Supreme Court of Colorado, En Banc.

April 23, 1990.

As Modified on Denial of Rehearing May 29, 1990.

Duane Woodard, Atty. Gen., Charles B. Howe, Chief Deputy Atty. Gen., Richard

Forman, Sol. Gen., and Bradley W. Cameron, Asst. Atty. Gen., Denver, for objector-appellant.

McKenna, Conner & Cuneo, Holly I. Holder and Kim J. Seter, Denver, for applicant-appellee.

Moses, Wittemyer, Harrison and Woodruff, P.C., Charles N. Woodruff, Veronica A. Sperling and Steven P. Jeffers, Boulder, for objectors-appellees.

Justice ERICKSON delivered the Opinion of the Court.

This is an appeal from the order of the water court for Water Division No. 1 that approved, subject to several provisions for retained jurisdiction, the plan for augmentation of not nontributary Denver aquifer ground water[1] proposed by applicant-appellee Castle Meadows, Inc.[2] Castle Meadows had previously obtained, for use as a municipal water supply, a decree for a water right to not nontributary Denver aquifer ground water that was not within a designated ground water basin. *See* § 37–90–137(4), 15 C.R.S. (1989 Supp.). The augmentation plan provides for replacement of four percent of the amount of water withdrawn on an annual basis to the affected streams throughout the period that ground water is actually pumped. The objector-appellants, the state engineer and the division engineer for Water Division No. 1 (both will be referred to as the state engineer), appeal the decree of the water court approving the plan for augmentation. On appeal, the state engineer contends that: (1) the water court erred by failing to impose terms and conditions to remedy injury to senior water right holders caused by depletions that occur after withdrawals cease, (2) the water court erred by failing to require replacement of depletions to West Plum Creek, and (3) the water court improperly imposed the burden of proof on the objectors to the plan for augmentation. We agree that the plan for augmentation must replace injurious depletions that result from the pumping of not nontributary ground water from the Denver aquifer and that occur after withdrawal has ceased. We do not agree with the state engineer's other contentions. Accordingly, we reverse in part, affirm in part, and remand with directions.

I.

Lincoln Savings and Loan Association, Castle Meadows' predecessor in interest, applied for water rights to Denver aquifer ground water in 1984. The Denver aquifer ground water, together with ground water from the other Denver Basin aquifers,[3] was intended to be used as a water supply for a planned community development consisting of residential, recreational, municipal, commercial and industrial uses. The land area for the development totals over 4,000 acres and is located in the East Plum Creek and West Plum Creek drainage systems. The streams, East and West Plum Creeks, are tributaries of the South Platte River. The application for water rights sought a decree for 2,990 acre-feet per year of nontributary ground water underlying approximately 3,900 acres of land. The state engi-

---

1. "Nontributary ground water" is legislatively defined in section 37–90–103(10.5), 15 C.R.S. (1989 Supp.) as underground water that is outside of a designated ground water basin that, when withdrawn, does not deplete the flow of a natural stream within one hundred years greater than one tenth of one percent of the annual amount of withdrawal. Section 37–90–103(10.5) is a recognition by the General Assembly that most withdrawals of ground water will have an effect on surface water rights at some point in time and the statute sets a de minimis level of tributary effect. Tributary ground water is not statutorily defined. Section 37–90–137(9)(c), 15 C.R.S. (1989 Supp.), the subject of this opinion, governs plans for augmentation of Denver aquifer ground water that does not meet the statutory definition of nontributary and uses the statutory term "not nontributary" to describe the ground water.

2. This court has jurisdiction over appeals from decisions of the water courts involving water right adjudications. Section 13–4–102(1)(d), 6A C.R.S. (1987). The state engineer has standing to object to an application for approval of a plan for augmentation. Section 37–92–302(1)(b), 15 C.R.S. (1989 Supp.); *Wadsworth v. Kuiper*, 193 Colo. 95, 562 P.2d 1114 (1977).

3. The Dawson, Denver, Arapahoe and Laramie–Fox Hills aquifers are referred to as the Denver Basin aquifers.

neer determined that the water sought in the application was not nontributary and the application was amended to reflect that determination. On April 29, 1987, the water court entered a decree that awarded Castle Meadows' predecessor in interest a not nontributary Denver aquifer ground water right in the amount of 2,990 acre-feet per year. The decree approved well sites that were greater than one mile from any point of contact between the aquifer and a surface stream and its alluvium. In addition, the decree conditioned use of the water right upon approval of a plan for augmentation calling for the replacement to the affected streams of four percent of the not nontributary ground water withdrawn on an annual basis.

In 1986, Castle Meadows' predecessor in interest filed an application for approval of a plan for augmentation to offset depletions that would be caused by the withdrawal of the not nontributary Denver aquifer ground water. The plan called for the return to East Plum Creek of four percent of the water withdrawn from the Denver aquifer. The sources of the water to be used for augmentation purposes were return flows and waste water from the development and direct discharge from the wellhead of not nontributary and nontributary ground water to East Plum Creek. The state engineer objected to the plan on the grounds that the plan failed to address the injury to vested water rights that would occur after withdrawal from the Denver aquifer ceased and that the plan did not provide for replacement of water to West Plum Creek.

The plan for augmentation was approved by the water court on December 29, 1989. The water court found that the plan's provisions, as approved, for replacement of depletions to East Plum Creek were sufficient to prevent injury to vested water rights. With respect to postpumping augmentation, the water court held that it had authority pursuant to section 37–90–137(9)(c), to require replacement of postpumping depletions, but that the requirement of such augmentation was discretionary. Over the objections of the state engineer, the court refused to require postpumping augmentation.

The water court also found that the development was partly within the West Plum Creek watershed and that there was "some connection" between the Denver aquifer and West Plum Creek. However, the water court did not find that depletions to West Plum Creek would occur and that the depletions would result in injury to water rights within the West Plum Creek watershed. The water court retained jurisdiction to determine if withdrawal of the not nontributary Denver aquifer water would cause injury to water rights in the West Plum Creek watershed and, if so, to determine if the return flows from the development to West Plum Creek would offset depletions to that stream. The decree provides that any party invoking the court's retained jurisdiction has the burden of going forward to establish a prima facie case of injury. After a prima facie case of injury is shown, pursuant to the decree the applicant has the burden of proof to establish lack of injury to other appropriators.

## II.

The state engineer's primary objection to Castle Meadows' plan for augmentation is the failure of the plan to replace depletions to the surface streams caused by the withdrawal of not nontributary Denver aquifer ground water after withdrawal has ceased. Wells completed in the Denver Basin aquifers are statutorily presumed to have a life of one hundred years. Section 37–90–137(4)(b)(I), 15 C.R.S. (1989 Supp.). Section 37–90–137(4)(b)(II) provides that "the amount of such ground water [described in section 37–90–137(4)(a)] available for withdrawal shall be that quantity of water, exclusive of artificial recharge, underlying the land owned by the applicant or underlying land owned by another" who has consented or who can be deemed to have consented to the applicant's withdrawal. Under section 37–90–137(4), the amount of water available for withdrawal by Castle Meadows from the Denver aquifer is limited to that set forth in the 1987 decree and,

at some point, Castle Meadows must cease withdrawing pursuant to that decree.

■ Plans for augmentation of wells completed in the Denver aquifer that withdraw not nontributary ground water are controlled by the statutory criteria set forth in section 37–90–137(9)(c), which provides:

As to wells which will be completed in the Dawson, Denver, Arapahoe, and Laramie–Fox Hills aquifers and will withdraw ground water which is not nontributary ground water, as defined in section 37–90–103(10.5), judicial approval of plans for augmentation shall be required prior to the use of such ground water. As to such wells completed in the Dawson aquifer, decrees approving such plans for augmentation shall provide for the replacement of actual stream depletion to the extent necessary to prevent any injurious effect, based upon actual aquifer conditions in existence at the time of such decree. As to such wells completed in the Denver, Arapahoe, or Laramie–Fox Hills aquifers more than one mile from any point of contact between any natural stream including its alluvium on which water rights would be injuriously affected by any stream depletion, and any such aquifer, such decrees shall provide for the replacement to the affected stream system or systems of a total amount of water equal to four percent of the amount of water withdrawn on an annual basis. As to such wells completed in such aquifers at points closer than one mile to any such contact, the amount of such replacement shall be determined using the assumption that the hydrostatic pressure level in each such aquifer has been lowered at least to the top of that aquifer throughout that aquifer. *Such decrees may also require the continuation of replacement after withdrawal ceases if necessary to compensate for injurious stream depletions caused by prior withdrawals from such wells and shall meet all other statutory criteria for such plans.*

(Emphasis added.) Section 37–90–137(9)(c) creates three separate classes of ground water with distinct standards for plans for augmentation for each class.[4]

The critical language, for the purposes of this opinion, is the last sentence of the subsection. The state engineer maintains that the last sentence requires a plan for augmentation of not nontributary Denver aquifer ground water to compensate for depletions caused after withdrawal has ceased. In support of this conclusion, the state engineer argues that the subsection is ambiguous in two respects: (1) it is not clear from the plain language of the statute that the last sentence applies to all three classes of ground water; and (2) it is not clear that the last sentence mandates postpumping replacement if injury to vested water rights is caused by postpumping depletions. In light of the alleged ambiguities, the state engineer asserts that, construing section 37–90–137(9)(c) according to the legislative intent to develop ground water while at the same time protecting existing vested water rights, a plan for augmentation must provide for the replacement of depletions occurring after pumping ceases that are caused by withdrawal of all three classes of ground water. Castle Meadows, on the other hand, contends that the last sentence of subsection 37–90–137(9)(c) applies only to wells completed in the Denver, Arapahoe or Laramie–Fox Hills aquifers that are closer than one mile to any contact between the aquifer and a surface stream or its alluvium. Therefore, Castle Meadows claims, section 37–90–137(9)(c) requires only that the plan for augmentation replace four percent of the amount of water withdrawn on an annual basis and does not require postpumping replacement.

Section 37–90–137(9)(c) was enacted as part of Senate Bill 5, Ch. 285, sec. 3, 1985 Colo.Sess.Laws, 1160, in the wake of our decision in *State v. Southwestern Colorado Water Conservation District*, 671 P.2d

---

**4.** Absent a valid constitutional challenge, the fairness, or the accuracy, of the statutory classifications created by section 37–90–137(9)(c) is not subject to judicial review. The General Assembly established the amount of water that must be replaced by a plan for augmentation for each class of not nontributary Denver Basin ground water.

1294 (Colo.1983) (*Huston II*). In *Huston II*, we held that nontributary ground water was not subject to the prior appropriation doctrine guaranteed by the Colorado Constitution and that the state has plenary power over the nontributary ground water resource. *Id.* at 1308, 1316. The General Assembly, in enacting Senate Bill 5, addressed the state's need for comprehensive regulation of nontributary ground water occurring outside of designated ground water basins. *See* Colorado Legislative Council, *Recommendations of the Committee on Nontributary Ground Water*, Pub. No. 292 (1984). In addition to providing for the administration of nontributary ground water, the General Assembly provided in Senate Bill 5 that Denver Basin ground water would be subject to a separate regulatory scheme and set forth statutory mandates to guide the administration of rights to Denver Basin ground water. *See* §§ 37–90–103(10.5), –137(4).

### A.

■ A statute must be given effect according to the intent of the legislature. *E.g., Ingram v. Cooper*, 698 P.2d 1314, 1315 (Colo.1985). If the legislative intent is clear from the plain language of the statute, the courts must give effect to the statute according to its plain language. *Griffin v. S.W. Devanney & Co.*, 775 P.2d 555, 559 (Colo.1989). However, if statutory language is ambiguous, a court must construe the statute according to the legislative intent underlying the statute. *Id.* Statutory language is ambiguous if it is reasonably susceptible to more than one meaning. *Id.* In this case, we agree that section 37–90–137(9)(c) is ambiguous. The statutes governing the acquisition and use of water resources are relevant in the interpretation of section 37–90–137(9)(c). *See Lucero v. Climax Molybdenum Co.*, 732 P.2d 642, 645 (Colo.1987) (when construing a statute, it is necessary to consider other legislation relating to the same subject matter, particularly when the statute is

part of a comprehensive legislative program).

The provisions of Senate Bill 5 are of prime importance in ascertaining the legislative intent underlying section 37–90–137(9)(c). Section 37–92–102(1)(a), amended by Senate Bill 5, provides in part that "it is the policy of this state to integrate the appropriation, use, and administration of underground water tributary to a stream with the use of surface water in such a way as to maximize the beneficial use of all the waters of this state." Section 37–90–103(10.5), added by Senate Bill 5, defines nontributary ground water as underground water outside of a designated ground water basin that, when withdrawn, does not deplete the flow of a natural stream within one hundred years greater than one tenth of one percent of the annual amount of withdrawal and also provides:

> The determination of whether ground water is nontributary shall be based on aquifer conditions existing at the time of permit application; except that, in recognition of the de minimis amount of water discharging from the Dawson, Denver, Arapahoe, and Laramie–Fox Hills aquifers into surface streams due to artesian pressure, when compared with the great economic importance of the ground water in those aquifers, and the feasibility and requirement of full augmentation by wells located in the tributary portions of those aquifers, it is specifically found and declared that, in determining whether ground water of the Dawson, Denver, Arapahoe and Laramie–Fox Hills aquifers is nontributary, it shall be assumed that the hydrostatic pressure level in each such aquifer has been lowered at least to the top of that aquifer throughout that aquifer.

Expert testimony established that, if you assume that the hydrostatic pressure level is at the top of the aquifer,[5] predictions on the effect of ground water withdrawal on a surface stream will show a less immediate

5. The hydrostatic pressure level of an aquifer at a particular location is the height to which water will rise in a well at that location. If the hydrostatic pressure level is at the top of the aquifer or below, the aquifer is not under artesian conditions. The Denver Basin aquifers are generally under artesian conditions throughout most of their areal extent.

effect than if the natural aquifer conditions are used in the calculations. The General Assembly, in requiring that the determination of whether ground water is nontributary be made under artificial conditions, expressly recognized the requirement of full augmentation of depletions caused by withdrawal of ground water from the not nontributary portions of the Dawson, Denver, Arapahoe and Laramie–Fox Hills aquifers. Section 37–90–103(10.5). Full augmentation requires replacement of depletions in the amount, location and *time* necessary to protect vested rights. Section 37–92–305(8), 15 C.R.S. (1989 Supp.).

Senate Bill 5 also required the state engineer to promulgate rules and regulations governing the withdrawal of ground water from the Dawson, Denver, Arapahoe and Laramie–Fox Hills formations. Section 37–90–137(9)(b). The Denver Basin regulations must "assure" that withdrawal of ground water from the Denver Basin aquifers "will not materially affect vested water rights to the flow of any natural stream." *Id.*

The provisions of Senate Bill 5 show the intent of the General Assembly to promote the maximum utilization of Denver Basin ground water consistent with the protection of vested water rights. To protect vested water rights and fulfill the legislative purpose underlying Senate Bill 5, section 37–90–137(9)(c) must be interpreted so that the postpumping replacement provision applies to all three classes of not nontributary Denver Basin ground water established in that subsection.

Section 37–90–137(9)(c) supersedes the general statutory requirements for a plan for augmentation of wells in the Dawson, Denver, Arapahoe and Laramie–Fox Hills aquifers as to the amount of water to be replaced while pumping operations are ongoing. However, the statutory standards for plans for augmentation in general are relevant to the interpretation of section 37–90–137(9)(c) and show that the General Assembly intended that the provision for postpumping replacement apply to all wells completed in the not nontributary portions of the Dawson, Denver, Arapahoe and Laramie–Fox Hills aquifers. Section 37–92–103(9), 15 C.R.S. (1989 Supp.), defines a plan for augmentation as "a detailed program to increase the supply of water available for beneficial use in a division or portion thereof by the development of new or alternate means or points of diversion, by a pooling of water resources, by water exchange projects, by providing substitute supplies of water, by the development of new sources of water, or by any other appropriate means." A plan for augmentation shall be approved if the plan "will not injuriously affect the owner of or persons entitled to use water under a vested water right or a decreed conditional water right." Section 37–92–305(3). Section 37–92–305(8) provides:

In reviewing a proposed plan for augmentation and in considering terms and conditions which may be necessary to avoid injury, the referee or the water judge shall consider the depletions from an applicant's use or proposed use of water, in quantity and in time, the amount and timing of augmentation water which would be provided by the applicant, and the existence, if any, of injury to any owner of or persons entitled to use water under a vested water right or a decreed conditional water right. A plan for augmentation shall be sufficient to permit the continuation of diversions when curtailment would otherwise be required to meet a valid senior call for water, to the extent that the applicant shall provide replacement water necessary to meet the lawful requirements of a senior diverter at the time and location and to the extent the senior would be deprived of his lawful entitlement by the applicant's diversion. Decrees approving plans for augmentation shall require that the state engineer curtail all out-of-priority diversions, the depletions from which are not so replaced as to prevent injury to vested water rights.

■ Plans for augmentation in general allow a water user to use water out of priority only if injury to holders of senior water rights is avoided. *Cache La Poudre Water Users Ass'n v. Glacier Meadows*, 191 Colo. 53, 61, 550 P.2d 288, 294 (1976).

Depletions must be replaced whenever they occur. Section 37–92–305(8). The augmentation statutes reflect the intent of the General Assembly, as foretold in *Fellhauer v. People*, 167 Colo. 320, 447 P.2d 986 (1968), to promote maximum development and use of Colorado's water resources while at the same time ensuring the protection of established water rights.

A plan for augmentation is a creature of statute. *See* § 37–92–103(9). Although section 37–90–137(9)(c) imposes certain requirements on a plan for augmentation of not nontributary Denver Basin ground water, the General Assembly, by using the term "plans for augmentation" in section 37–90–137(9)(c), intended that the term carry the same meaning in that subsection as elsewhere in the statutes governing water resources. The requirement of postpumping augmentation is consistent with the statutory purposes of a plan for augmentation.

The last sentence of section 37–90–137(9)(c) provides that "[s]uch decrees may also require the continuation of replacement after withdrawal ceases if necessary to compensate for injurious stream depletions caused by prior withdrawals from such wells and shall meet all other statutory criteria for such plans." The structure of the last sentence of section 37–90–137(9)(c) establishes, in our view, that the postpumping replacement provision is applicable to all three classes of ground water created by the statute. The language "such wells" and "such decrees" is used throughout the subsection to refer to wells completed in the not nontributary portions of the Dawson, Denver, Arapahoe and Laramie–Fox Hills aquifers and the decrees approving plans for augmentation for the wells.[6]

In light of the legislative intent underlying Senate Bill 5, the general statutory requirements for plans for augmentation and the structure of section 37–90–137(9)(c), we construe the post-withdrawal replacement provisions of section 37–90–137(9)(c) to apply to all wells completed in the Dawson, Denver, Arapahoe and Laramie–Fox Hills aquifers that withdraw not nontributary ground water.

## B.

The second ambiguity asserted by the state engineer centers on the language "[s]uch decrees *may* also require the continuation of replacement after withdrawal ceases if necessary to compensate for injurious stream depletions caused by prior withdrawals from such wells." (Emphasis added.) An alternate definition of the word "may," if used in a statute, is "must" or "shall." *Websters New Third International Dictionary* 1396 (1983). If the legislative purpose underlying the statute is not fulfilled by a permissive construction, "may" is construed to impose the mandatory requirement associated with the word "shall." "There is no universal rule by which directory provisions may, under all conditions, be distinguished from those which are mandatory. The intention of the legislature, however, should be controlling and no formalistic rule of grammar or word form should stand in the way of carrying out the legislative intent." 1A N. Singer, *Sutherland Statutory Construction*, § 25.03, 441–42 (4th ed. 1984) (footnotes omitted). *See also Duprey v. Anderson*, 184 Colo. 70, 518 P.2d 807 (1974) ("may" means must or shall to avoid an unconstitutional result).

Here, the legislative policy of protection of vested water rights that underlies section 37–90–137(9)(c) and Senate Bill 5 requires a mandatory interpretation of the last sentence of the subsection. We hold that once a determination is made that injurious depletions to vested water rights, caused by withdrawal of not nontributary ground water from the Dawson, Denver, Arapahoe and Laramie–Fox Hills aquifers, occur after pumping ceases, section 37–90–

---

6. The rule of statutory construction that provides that relative and qualifying terms, "such decrees" in this case, are construed to refer solely to the last antecedent phrase with which they are closely connected unless a contrary legislative intent appears is no longer applicable in Colorado. Section 2–4–214, 1B C.R.S. (1989 Supp.).

137(9)(c) mandates that a plan for augmentation replace such depletions.

## C.

 At trial, the state engineer presented evidence of depletions to East Plum Creek for a period of two hundred years after cessation of withdrawal from Castle Meadows' Denver aquifer wells. Castle Meadows did not dispute the evidence of postpumping depletions, and the water court found that such depletions would occur. The water court, however, did not find such depletions to be injurious to vested water rights. Since post-withdrawal augmentation is required for wells completed in the not nontributary portions of the Denver aquifer pursuant to section 37–90–137(9)(c), we remand this case to the water court for a further hearing and the consideration of such evidence as may be necessary to determine whether the post-withdrawal depletions will be injurious. If the water court finds the projected depletions to be injurious, it shall impose terms and conditions on the plan for augmentation to alleviate injury caused by depletions to the affected streams after withdrawals from Castle Meadows' Denver aquifer wells cease. If upon remand the water court is unable to make a determination as to whether the depletions will be injurious, it shall retain jurisdiction on the issue of injury caused by post-withdrawal depletions for such a time period as it deems appropriate, section 37–92–304(6), 15 C.R.S. (1989 Supp.).

## III.

The state engineer contends that the water court erred by failing to require Castle Meadows to replace depletions to West Plum Creek that will be caused by withdrawal of ground water pursuant to Castle Meadows' decreed Denver aquifer water right. The factual issue of whether there

is a hydrologic connection between the Denver aquifer and West Plum Creek was contested and the evidence presented by the parties on the issue was contradictory. The water court found, somewhat equivocally, that there was a connection between the Denver aquifer and West Plum Creek. However, the water court did not find that depletions would occur to West Plum Creek or that holders of West Plum Creek water rights would be injured by withdrawal of ground water by Castle Meadows from the Denver aquifer. Instead, the water court provided for retained jurisdiction for a period of twenty years in which to determine if Castle Meadows' Denver aquifer withdrawals would cause depletions to West Plum Creek. *See* § 37–92–304(6), 15 C.R.S. (1989 Supp.).[7]

 The touchstone of a plan for augmentation is the prevention of injury to vested water rights. *Glacier Meadows,* 191 Colo. at 61, 550 P.2d at 294. An objector to a plan for augmentation need not show an injury to a specific water right, only injury to senior appropriators in general. *Hall v. Kuiper,* 181 Colo. 130, 134, 510 P.2d 329, 331 (1973); *Fellhauer v. People,* 167 Colo. at 329–30, 447 P.2d at 991. In this case, the water court could not determine whether injurious depletions would occur to West Plum Creek water rights. As an appellate court, we are not in a position to make a determination on the issue of injury to West Plum Creek water rights based on the record in this case. Under the circumstances, the water court properly retained jurisdiction in order to determine if injurious depletion to West Plum Creek will in fact result from Castle Meadows' exercise of its Denver aquifer water right.

## IV.

Finally, the state engineer contends that the water court improperly placed the bur-

---

7. Section 37–92–304(6) provides in part:

Any decision of the water judge as specified in subsection (5) of this section dealing with a change of water right or a plan for augmentation shall include the condition that the approval of such change or plan shall be subject to the reconsideration by the water judge on

the question of injury to the vested rights of others for such period after the entry of decisions is necessary or desirable to preclude or remedy any such injury.... Any decision may contain any other provision which the water judge deems proper in determining the rights and interests of the persons involved.

den of proof to show injury on the objectors to Castle Meadows' plan for augmentation. The decree approving the plan for augmentation provides that any party that invokes the court's retained jurisdiction to request a modification of the plan for augmentation must make a prima facie showing of facts warranting the court's exercise of its retained jurisdiction before Castle Meadows must prove that no injury exists, that any injury is alleviated by the plan, or that terms and conditions proposed by Castle Meadows remedy the asserted injury.[8]

 The proponent of a plan for augmentation has the burden to establish the absence of injury resulting from the out-of-priority diversion of water. Section 37–92–304(3), 15 C.R.S. (1989 Supp.); *Kelly Ranch v. Southeastern Colorado Water Conservancy Dist.*, 191 Colo. 65, 77, 550 P.2d 297, 306 (1976) ("[T]he burden is upon the proponent of a proposed plan for augmentation to prove the amount of return flow from in-house use of water withdrawn from wells on the property. . . ."). The decree in this case does not place the burden of proof on an objector to the plan but instead requires an objector to make a prima facie showing that the plan is not adequate to prevent injury to vested water rights. An objector to an application for a change of a water right has the burden of going forward to show injury. *Ackerman v. City of Walsenburg*, 171 Colo. 304, 310, 467 P.2d 267, 270 (1970). The proponent of a plan for augmentation has the same burden of proof as an applicant for a change of a water right. Section 37–92–304(3). The provision placing the burden to go forward on the objectors to the plan for augmentation to establish a prima facie case of injury is consistent with section 37–92–304(3) and the water court did not err by including the provision as a condi-

tion to invoking the retained jurisdiction of the water court.

## V.

Castle Meadows' plan for augmentation must replace injurious depletions that will occur after Castle Meadows ceases withdrawal of not nontributary Denver aquifer ground water from its wells. The water court in this case did not find that postwithdrawal depletions would be injurious and we remand for the water court to make a determination of injury. If the water court finds that injury will occur to vested rights, it shall impose terms and conditions on the plan for augmentation to remedy such injury. If the water court is unable to determine if injury will occur, it shall retain jurisdiction on the issue for an appropriate period of time. Since the water court did not find that depletions would occur to West Plum Creek caused by Castle Meadows' withdrawal of Denver aquifer ground water or that injury would occur to West Plum Creek water rights, it did not err by failing to require replacement to West Plum Creek. Instead, the water court properly retained jurisdiction to determine if injurious depletions to West Plum Creek would occur. Finally, the water court did not err by requiring a party who invokes the court's retained jurisdiction to make a prima facie showing of injury.

Accordingly, we reverse in part, affirm in part, and remand with directions to conduct further proceedings consistent with this opinion.

**8.** The decree provides:

The petition to invoke retained jurisdiction or to modify the decree shall set forth with particularity the factual basis upon which the requested reconsideration is premised, together with proposed decretal language to affect the petition. Unless otherwise stated herein, the party lodging the petition shall have the burden of going forward to establish the *prima facie* facts alleged in the petition. If the

court finds those facts to be established, the Applicant shall thereupon have the burden of proof to show: (a) that any modification sought by the Applicant will avoid injury to other appropriators, or (b) that any modification sought by Objectors is not required to avoid injury to other appropriators, or (c) that any term or condition proposed by Applicant in response to the Objector's petition does avoid injury to other appropriators.