CONCERNING the APPLICATION FOR PLAN FOR AUGMENTATION OF the CITY AND COUNTY OF DENVER, acting by and through its BOARD OF WATER COMMISSIONERS,

The City of Thornton, Objector–Appellant,

v.

The City and County of Denver, acting by and through its Board of Water Commissioners, Applicant–Appellee,

and

Centennial Water and Sanitation District, the City of Aurora, the City of Englewood, and Henrylyn Irrigation District, Objector–Appellees,

and

Richard Stenzel, Division Engineer, Water Division 1, Appellee pursuant to C.A.R. 1(e).

No. 00SA302.

Supreme Court of Colorado.

Feb. 25, 2002.

As Modified on Denial of Rehearing April 29, 2002.

White & Jankowski, LLP, Michael D. White, William A. Hillhouse, II, Austin C. Hamre, David C. Taussig, Sarah A. Klahn, Denver, CO, Attorneys for Objector–Appellant.

Patricia L. Wells, Michael L. Walker, Casey S. Funk, Kristi K. Riegle, Denver, CO, Attorneys for Applicant–Appellee.

Moses, Wittemyer, Harrison, & Woodruff, P.C., Veronica A. Sperling, Boulder, CO, Attorneys for Objector–Centennial Water and Sanitation District.

Chrisman, Bynum & Johnson, P.C., David G. Hill, Jack M. Graves, Kristin M. Berdan, Boulder, CO, Attorneys for Objector–Appellee City of Englewood.

Friedlob Sanderson Paulson & Tourtillott, LLC, Brian M. Nazarenus, William B. Tourtillott, Denver, CO, Attorneys for Amici Curiae City of Loveland, Public Service Company of Colorado, d/b/a Xcel Energy, Climax Molybdenum Company, and the City of Fountain.

Justice MARTINEZ delivered the Opinion of the Court.

The City of Thornton ("Thornton") appeals the order of the District Court for Water Division No. 1 ("water court") denying Thornton's petition to extend the period of retained jurisdiction, *see* § 37–92–304(6), 10 C.R.S. (2001), agreed to by Thornton and the City and County of Denver, acting by and through its Board of Water Commissioners ("Denver"), in a stipulated decree later approved by the water court. Thornton filed a timely petition seeking to invoke the retained jurisdiction provision. The petition requested that the water court reconsider its finding of non-injury to Thornton and other senior water appropriators in light of the actual operation of Denver's Augmentation Plan. Specifically, Thornton alleged that the effluent discharged from the Bi–City Wastewater Treatment Plant ("the Bi–City plant"), as a substitute water supply under Denver's Augmentation Plan, was unsuitable for Thornton's use as a municipal water supply. The water court denied the petition without a hearing. We conclude that the water court had an obligation to reconsider the question of injury to Thornton and other senior appropriators. Therefore, we reverse the water court's decision not to hold a hearing to address Thornton's alleged injury from the operation of Denver's Augmentation Plan, or in the alternative, to extend the period of retained jurisdiction pending resolution of common water quality issues in the Denver exchange case that the water court currently has before it.

## I. Facts and Procedural History

In April 1991, Denver petitioned for an augmentation plan to allow for out-of-priority diversions from the South Platte River for the irrigation of the Overland Park Golf Course. Denver's Proposed Augmentation Plan provided for a substitute supply using effluent from the Bi–City plant. Thornton, the Centennial Water and Sanitation District, the City of Englewood, Henrylyn Irrigation District, and the City of Aurora filed timely Statements of Opposition. Because Thornton diverts water from the South Platte River downstream from the Bi–City plant for its own water supply system, Thornton alleged potential water quality injuries.[1] In particular, Thornton expressed concern regarding

---

1. Although Thornton initially argued water quantity injuries, the parties agree that quantity is not an issue with respect to retained jurisdiction in this case and we do not address the issue here.

the effect of Denver's Proposed Augmentation Plan on the concentration of pollutants in the river at Thornton's point of diversion. Thornton chose not to proceed to trial, at which Denver would have had to prove the absence of injury resulting from Denver's Proposed Augmentation Plan. Instead, on March 11, 1993, Thornton stipulated to the entry of a decree granting Denver's application for an augmentation plan,[2] provided that the terms of the decree were "not less restrictive" than the attached proposed decree. At that time, Thornton agreed to the substitution of Platte River water for Bi–City effluent and agreed the effluent adequately met its lawful requirements so that Denver's Augmentation Plan would not injuriously affect Thornton's vested water rights.

On May 24, 1993, the water court approved the terms of Denver's Augmentation Plan. At the request of both parties and pursuant to section 37–92–304(6), the water court retained jurisdiction over the case for seven (7) years. See § 37–92–304(6). On May 23, 2000, Thornton filed a timely Petition Invoking Retained Jurisdiction. Thornton claimed that changes in the operation of the Bi–City plant since 1993 have increased the levels of phosphorous, nitrate, nitrite, harmful types of dissolved organic carbon and microbiological contaminates in the Bi–City effluent, making the water supply unsuitable for Thornton's normal use as a municipal water supply. The petition requested that the water court extend the period of retained jurisdiction in this case (91CW28) until the resolution of another ongoing dispute between Denver and Thornton (the Denver exchange case—96CW145). The Denver exchange case concerns Thornton's alleged injury from Denver's use of Bi–City effluent and other water sources as a substitute supply. Thornton argues the current case and the Denver exchange case present parallel allegations of injury and common factual issues, including the suitability of Bi–City effluent as a substitute supply for a downstream user who is a municipal water supplier. Specifically, the Denver exchange case concerns "the health

effects of pollutants contained in Bi–City effluent."

Similarly, Thornton's Petition to Invoke Retained Jurisdiction contended:

Since the entry of the decree in this case in 1993, the injury to Thornton from the operation of Denver's Overland Park augmentation plan, and particularly the use of Bi–City effluent, has become apparent. For example, the use of Bi–City effluent has caused injurious water quality effects that include, but are not limited to, increasing concentrations of phosphorous, nitrate and nitrite, [and] harmful types of dissolved organic carbon and microbiological contaminates.

R. at 104–05. Thornton continued:

The nature and extent of Thornton's injury from Denver's use of Bi–City effluent was not fully known when the decree was entered in this case.... [H]owever, the health effects of pollutants contained in Bi–City effluent have come to be better understood, and the injury produced by the use of Bi–City effluent as a substitute supply has become a central issue in the ongoing litigation between Denver and Thornton in Case No. 96CW145 (the Denver exchange case).... [T]here has been substantial evidence that Denver's use of Bi–City effluent as a substitute supply injures Thornton. Certainly the nonoccurrence of injury has not been conclusively established.

R. at 105. Thornton therefore requested that the water court hold proceedings on the necessity for modification of Denver's Augmentation Plan, or alternatively, extend the period of retained jurisdiction and defer the question of injury until the resolution of common factual questions raised by the Denver exchange case.

The water court refused to extend the period of retained jurisdiction for the resolution of the Denver exchange case, noting that Thornton had stipulated to Denver's use of Bi–City effluent as part of Denver's Augmentation Plan. R. at 189. The water court found that better understanding of the detri-

2. The Centennial Water and Sanitation District, the City of Englewood, Henrilyn Irrigation District, and the City of Aurora also entered into

stipulated decrees prior to trial, none of which is at issue here.

mental water quality effects of wastewater treatment plant effluent was not the type of injury the general assembly intended the retained jurisdiction statute to address. R. at 189. The court stated:

> To allow jurisdiction to be retained, pending the factual findings of a later case, would frustrate the final judgments of the Water Court, as well as the justifiable reliance of the parties on the finality of the prior proceedings. If new light has been shed on the injurious effects of effluent upon other users, the proper forum in which to address this potential injury is to oppose subsequent applications that implicate such injury.

*Id.* The water court therefore denied Thornton's motion to extend the period of retained jurisdiction.[3] *Id.*

## II. Legal Background

Although this case concerns the retained jurisdiction provision of section 37–92–304(6), a discussion of the prior appropriation doctrine and the role of augmentation plans is necessary to understand the general assembly's intent that the retained jurisdiction provision operate as a test period of the water court's initial prediction of non-injury. Accordingly, we first discuss the role of augmentation plans in the state's policy of maximum utilization of water. Second, we explain the scope and purpose of the retained jurisdiction provision. Third, we discuss the relationship between Colorado caselaw regarding water quality, the Water Quality Control Act ("WQCA"), the Colorado Constitution, and the Water Right Determination and Administration Act ("WRDAA"). Finally, we apply our analysis to the facts of this case.

■■■ After analyzing this case as described, we conclude that the water court erroneously held that the retained jurisdiction provision did not permit the court to revisit its initial determination of non-injury to Thornton under Denver's Augmentation Plan. The retained jurisdiction period functions as a test period of the water court's prediction of non-injury to senior appropriators from an augmentation plan. *Farmers Res. & Irr. Co. v. Consol. Mut. Water Co.,* 33 P.3d 799, 806 (Colo.2001). As explained below, retained jurisdiction should be invoked where the operational experience of an augmentation plan demonstrates that substituted water is not "of a quality ... to meet the requirements for which the water of the senior appropriator has normally been used." § 37–92–305(5), 10 C.R.S. (2001). In spite of the water court's prediction that Denver's Augmentation Plan would not injuriously affect Thornton, the plan's actual operation may not provide replacement water suitable for Thornton's normal use of South Platte water at its point of diversion in comparison to the quality of water it received before Denver's Augmentation Plan was approved. Under such circumstances, the water court has an obligation to invoke retained jurisdiction to prevent injury to senior appropriators like Thornton. Otherwise, the water court would be unable to ensure the quality of the water supply as required by section 37–92–305(3). In the interest of preserving the finality of water appropriations, the water court's ability to revisit injury determinations is limited to the period of retained jurisdiction, or its extension by the court.

### A. Augmentation Plans

■■■ The Colorado Constitution makes the unappropriated "water of every natural stream" within the state the "property of the public" for the "use of the people of the state." Colo. Const. art. XVI, § 5. Therefore, Colorado water law is governed by the doctrine of prior appropriation.[4] *See* Colo. Const. art. XVI, § 6; *Coffin v. Left Hand Ditch Co.,* 6 Colo. 443, 447 (1882). Generally,

---

3. The water court found Thornton had alleged an arguable injury so that its reliance on the retained jurisdiction provision of section 37–92–304(6) was not wholly frivolous or lacking in subject-matter jurisdiction. *Id.* The water court thus declined to award attorney's fees to Denver. *Id.*

4. The doctrine of prior appropriation imposes three requirements for acquiring a water right: intent to make an appropriation, a taking of the water, and an application of the water to beneficial use. *Colo. River Water Conservation Dist. v. Rocky Mountain Power Co.,* 158 Colo. 331, 333, 406 P.2d 798, 799 (1965).

the first appropriator of water for a beneficial use has a prior right to the water to the extent of such appropriation. *Coffin*, 6 Colo. at 447. Thus, much of the value of a water right lies in its priority. *See* Gregory J. Hobbs, Jr., *Symposium: Colorado's 1969 Adjudication and Administration Act: Settling In*, 3 U. Denv. Water L.Rev. 1, 7–12 (1999).

▮ The WRDAA provides for the adjudication of water rights changes, exchanges, and augmentation plans. Through such adjudications, the WRDAA seeks to allow new water users to operate consistently with the administration of decreed water rights under the prior appropriation system. *Farmers Res. & Irr. Co.*, 33 P.3d at 806; § 37–92–302, 10 C.R.S. (2001). Thus, the WRDAA furthers the state's policy of efficiently managing, administering, and optimizing water use for the operation of as many decreed uses as there is an available water supply. *Farmers Res. & Irr. Co.*, 33 P.3d at 806. Water right changes, exchanges, and augmentation plans allow diversions as long as the prior appropriators' rights are unharmed. § 37–92–305(3), (5), § 37–80–120; §37-83-104, 10 C.R.S. (2001); James N. Corbridge, Jr. & Teresa A. Rice, *Vranesh's Colorado Water Law Revised Ed.* 142–144 (1999) [hereinafter *Vranesh's*]. Because this case concerns Denver's Augmentation Plan, we limit our discussion to augmentation plans.

▮ When no unappropriated water is available, augmentation plans permit junior water right holders to divert water out-of-priority while ensuring the protection of senior water right holders. *Farmers Res. & Irr. Co.*, 33 P.3d at 806 (citing *Danielson v. Castle Meadows, Inc.*, 791 P.2d 1106, 1112 (Colo. 1990)). An augmentation plan is defined as:

> A detailed program ... to increase the supply of water available for beneficial use in a division or portion thereof by the development of new or alternate means or points of diversion, by pooling of water resources, by water exchange projects, by providing substitute supplies of water, by the development of new sources of water, or by any other appropriate means....

§ 37–92–103(9), 10 C.R.S. (2001); *City of Florence v. Bd. of Waterworks of Pueblo*, 793 P.2d 148, 151 (Colo.1990). Junior appropriators typically provide an augmented water supply to offset their out-of-priority depletions so that holders of decreed water rights can enjoy the quantity of supply that would be available to them absent those depletions. *Farmers Res. & Irr. Co.*, 33 P.3d at 806.

▮ Section 37–92–305(3) expressly requires augmentation plans be made with due regard for the rights of other appropriators of the same water source. A water court proceeding for approval of an augmentation plan is mandatory and can be approved only if there is "no-injurious effect" to a vested water right. *Danielson*, 791 P.2d at 1112; *Vranesh's, supra* at 144; *see also* § 37–92–305(5). Where injury is likely to occur, terms and conditions may be included in decrees for augmentation plans to prevent injury. § 37–92–305(3), (4). If the substituted water is "of a quantity and quality so as to meet the requirements for which the water of the senior appropriator has normally been used," the proposed substitution must be accepted. § 37–92–305(5).

▮ This court has recognized that full augmentation requires replacement of water depletions in the amount, location, and time necessary to protect vested rights. *Farmers Res. & Irr. Co.*, 33 P.3d at 806. The proponent of an augmentation plan has the burden of establishing the absence of injury resulting from the out-of-priority diversion of water. § 37–92–304(3), 10 C.R.S. (2001); *Danielson*, 791 P.2d at 1115. An objector to an augmentation plan need not show an injury to a specific water right; injury to senior appropriators in general is enough. *Danielson*, 791 P.2d at 1114. Where a statement of opposition is filed, the applicant provides the water court with a proposed ruling or decree designed to prevent such injurious effect. § 37–92–305(3); *City of Thornton v. Clear Creek Water Users Alliance*, 859 P.2d 1348, 1358 (Colo.1993). If the water court finds that injury will occur to vested rights, it must impose terms and conditions on the augmentation plan to remedy such injury. *Danielson*, 791 P.2d at 1112.

## B. Retained Jurisdiction

Because the actual effects of an augmentation plan cannot always be accurately predicted, the general assembly has provided for a period of retained jurisdiction in which the water court may reconsider possible injury to senior appropriators. Section 37–92–304(6) provides:

Any decision of the water judge ... dealing with a change of water right or a plan for augmentation shall include the condition that the approval of such change or plan shall be subject to reconsideration by the water judge on the question of injury to the vested rights of others for such period after entry of such decision as is necessary or desirable to preclude or remedy such injury. Such condition setting forth the period allowed for reconsideration shall be determined by the water judge after making specific findings and conclusions including, when applicable, the historic use to which water rights involved were put, if any, and the proposed future use of the water rights involved. The water judge shall specify his determination as to such period in his decision, but the period may be extended upon further decision by the water judge that the nonoccurrence of injury shall not have been conclusively established.

§ 37–92–304(6); see Farmers Res. & Irr. Co., 33 P.3d at 805 (holding that a water court's historic use determinations may not be reviewed under the retained jurisdiction provision); Clear Creek Water Users Alliance, 859 P.2d at 1358 (stating that water court retained jurisdiction to allow for reconsideration of injury determination where application for change of water rights did not specify a diversion point).

Section 37–92–304(6) reflects the two stages of the water court's future injury analysis. Farmers Res. & Irr. Co., 33 P.3d at 811. The first stage is based on predicting the future effects of an augmentation plan. Id. The second stage is based on operational experience of the augmentation plan. Id. Retained jurisdiction provides the water court and water users with the flexibility to implement programs that maximize the beneficial use of water while protecting the vested rights of senior water appropriators. See City of Florence, 793 P.2d at 157.

Retained jurisdiction protects the rights of parties opposed to an augmentation plan because it allows the water court to reconsider the question of injury until the nonoccurrence of injury to the objecting party's water rights is conclusively established. Clear Creek Water Users Alliance, 859 P.2d at 1360. The water court sets the length of retained jurisdiction at the period of time it finds "necessary or desirable to preclude or remedy such injury" based on the evidence. § 37–92–304(6); Farmer's Res. & Irr. Co., 33 P.3d at 806. The water court may later extend the period of retained jurisdiction "upon further decision" that the "nonoccurrence of injury shall not have been conclusively established." Farmers Res. & Irr. Co., 33 P.3d at 806. However, the judgment and decree remain "appealable upon entry, notwithstanding conditions subjecting the decisions to reconsideration on the question of injury to the vested rights of others." § 37–92–304(6); Farmers Res. & Irr. Co., 33 P.3d at 806.

Because the water court has already determined non-injury at the time of entry of the decree, the water court may require a party seeking to invoke the court's retained jurisdiction to make a prima facie showing of injury from the augmentation plan's operation. Farmers Res. & Irr. Co., 33 P.3d at 811; Danielson, 791 P.2d at 1115. Upon such a showing, the burden of showing non-injury shifts to the decree-holder. Farmers Res. & Irr. Co., 33 P.3d at 811–12. This injury analysis has traditionally focused on the time, amount, and location of return flows of surface water and groundwater. Id. at 807 n. 6.

Once a party demonstrates injury to its water rights, the water court must require additional or modified protective conditions to prevent injury. Id. at 812. The water court may also extend the period of retained jurisdiction as long as necessary to ascertain non-injury from operation of the augmentation plan. Id. The water court abuses its discretion by refusing to require additional or modified protective conditions

to prevent injury, or by refusing to extend the period of retained jurisdiction to ascertain the non-occurrence of injury, once the person seeking a change has met the initial burden of establishing injury under the statute and the decree-holder has not met the burden of demonstrating non-injury. *Id.* at 811.

■ The water court may reopen the inquiry into protective conditions upon sufficient showing that other water rights holders experienced water shortages resulting from failure to implement the protective conditions or because protective conditions adopted in the judgment and decree did not sufficiently protect against injury. *Id.* at 810. Alternatively, the water court may extend the period of retained jurisdiction if it finds the non-occurrence of injury has not been conclusively established. *Id.*

■ The focus of retained jurisdiction is not upon changed circumstances or unanticipated injury. *Id.* Instead, the proper focus of retained jurisdiction is the injurious effects of the operation of the augmentation plan. *Id.* The statute addresses the water court's role in predicting the potential injurious effect of the augmentation plan and the measures needed to prevent injury once the change takes operational effect upon the stream system. *Id.*

Our decision in *City of Thornton v. Clear Creek Water Users Alliance*, 859 P.2d 1348 (Colo.1993), demonstrates the use of retained jurisdiction where some uncertainty exists about whether a proposed water decree for an augmentation plan will produce injury to water appropriators. The water court may anticipate better information about potential injury once the plan becomes operational. Under such circumstances, retained jurisdiction temporarily preserves the question of injury notwithstanding the water court's initial determination of non-injury. Without this retained jurisdiction, the water court's responsibility of ensuring the suitability of replacement water utilized in an augmentation plan could not be met, particularly where the augmentation plan's operation proves the water court's prediction of non-injury incorrect.

■ *Clear Creek Water Users Alliance* used retained jurisdiction to address possible injury to water quantity, an issue that lies within the water court's traditional scope of authority. *Clear Creek Water Users Alliance*, 859 P.2d at 1348. Water quantity issues typically include any discrepancies in the time, amount, and location of return flows of water. *Clear Creek Water Users Alliance* concerned Clear Creek Water Users Alliance's ("CCWUA") application for a change of a conditional water right involving five alternative storage sites. Thornton opposed the application, arguing that the city would be injured by the proposed decree.

The water court approved the change despite CCWUA's failure to designate a specific storage size or location, and the corresponding uncertainty in possible injury to Thornton as a result of the change. Acknowledging the difficulty in determining any injury to Thornton or other senior appropriators in the absence of specifics regarding the storage site, the water court retained jurisdiction over the matter for five years until CCWUA could be more specific about the change. *Id.* at 1359.

Thornton objected to both the approval of the plan and the water court's calculation of retained jurisdiction. *Id.* at 1360. Specifically, Thornton argued that the five-year period of retained jurisdiction should not begin to run until "the full and actual operation of the water right as changed" had begun. *Id.* The city maintained that only after the reservoirs were built and used would the water court be equipped with the operational facts necessary to examine the diversion, use and return flows, and determine whether water users like Thornton would be injured by the decree. *Id.* Thus, Thornton contended that the water court had erroneously granted the decree.

We upheld the water court's approval of CCWUA's application for a change in the association's conditional right to store water and the water court's use of retained jurisdiction to ensure that Thornton and other senior water users were in fact uninjured by the decree once CCWUA chose a specific storage site. *Id.* We first noted that the law did not require an applicant to specify a diversion

point. *Id.* We next noted that the water court had found no showing of injury to Thornton at the entry of the decree. *Id.* Therefore, we held that the water court appropriately approved the plan. *Id.* The retained jurisdiction provision began to run from the time of the decree and not from the time the change in the conditional water right became operational. *Id.* However, the court noted that the water court could extend the five-year period of retained jurisdiction if it found that non-injury to Thornton and other senior water appropriators had not been conclusively established once the change of conditional water right became operational. *Id.*

### III. Retained Jurisdiction and Water Quality

Denver seeks to distinguish *Clear Creek Water Users Alliance* from the present case on the basis that *Clear Creek Water Users Alliance* concerned the use of retained jurisdiction in relation to water quantity issues, which unquestionably lie within the water court's jurisdiction, and not water quality issues. Denver rests its distinction with the fact that the WQCA grants the Department of Health and the nine-member Water Quality Control Commission ("WQCC") authority over state water quality and the prevention of water pollution. *See* §§ 25–8–103, –201, –202, 8 C.R.S. (2001). In order to assess the merits of Denver's distinction between water quantity and water quality with respect to retained jurisdiction, it is necessary to understand the relationship between Colorado caselaw regarding water quality, the WQCA, the Colorado Constitution, and the WRDAA.

### A. Water Quality Caselaw

It is true, as Denver argues, that Colorado water law has historically focused on water quantity issues so that the law regarding water quality is not well developed. *See Vranesh's, supra* at 471. Notwithstanding the lack of focus on water quality issues, we have protected water quality to the extent necessary to preserve the water's suitability for the uses of appropriators. *See Slide Mines, Inc. v. Left Hand Ditch Co.*, 102 Colo. 69, 73, 77 P.2d 125, 127 (1938) (finding that

extraneous matter introduced into a stream by farmers that did not unfavorably affect the use of the water they were entitled to make but was beneficial to it did not constitute pollution in a legal sense). Upon rehearing its original decision in *Wilmore v. Chain O'Mines, Inc.*, 96 Colo. 319, 44 P.2d 1024 (1934), this court defined "pollution" as

> an impairment, with attendant injury, to the use of water that [downstream appropriators] are entitled to make. Unless the introduction of extraneous matter so unfavorably affects such use, the condition created is short of pollution. In reality, the thing forbidden is injury.

Thus, *Chain O'Mines* established a common law theory based on the prior appropriation doctrine that prohibits the discharge of contaminates into streams where doing so makes the water unsuitable for an appropriator's normal use of the water. In addition, we concluded that injury occurred where the Game and Fish Commission's diversion of water through a fish hatchery rendered the water unfit for Farmers Irrigation Company's normal irrigation and domestic use. *See Game & Fish Comm'n v. Farmers Irr. Co.*, 162 Colo. 301, 426 P.2d 562 (1967); *Farmers Irr. Co. v. Game & Fish Comm'n*, 149 Colo. 318, 369 P.2d 557 (1962).

### B. Water Quality Control Act

Current statutory law delegates most authority over water quality issues to the WQCC. The general assembly enacted the WQCA, §§ 25–8–101 to –703, 8 C.R.S. (2001), in response to the federal Clean Water Act. The purpose of the WQCA is

> to prevent injury to beneficial uses made of state waters, to maximize the beneficial uses of water, and to develop water to which Colorado and its citizens are entitled, and, within this context, to achieve the maximum practical degree of water quality in the waters of the state consistent with the welfare of the state.

§ 25–8–103, 8 C.R.S. (2001). Thus, the Act sought to provide the maximum protection for water quality possible without threatening the prior appropriation system and the state's policy of maximum beneficial use of

the water. The general assembly also sought

to conserve state waters and to protect, maintain, and improve, where necessary and reasonable, the quality [of state waters] for public water supplies, for protection and propagation of wildlife and aquatic life, for domestic, agricultural, industrial, and recreational uses, and for other beneficial uses, taking into consideration the requirements of such uses; to provide that no pollutant be released into any state waters without first receiving the treatment or other corrective action necessary to reasonably protect the legitimate and beneficial uses of such waters; [and] to provide for the prevention, abatement, and control of new or existing water pollution.

*Id.* Thus, the WQCA expresses an intent to prevent water pollution and specifically refers to the need to protect the beneficial use of water in a variety of different contexts.

■ The state's purpose of protecting water quality is served by a nine-member WQCC authorized by the WQCA to develop and maintain a comprehensive program for the prevention, control, and abatement of water pollution, and water quality protection. §§ 25–8–201–, –202; *Vranesh's, supra* at 476. Although the WQCA gives the WQCC general authority over water quality issues, the WQCA is not intended to interfere with the water court's role in adjudicating water rights administered by the State Engineer. Section 25–8–104(1) of the WQCA explicitly provides that:

No provision of this article shall be interpreted so as to supercede, abrogate, or impair rights to divert water and to apply water to beneficial uses in accordance with sections 5 and 6 of article XVI of the constitution of the state of Colorado, compacts entered into by the state of Colorado, or *the provisions of articles 80 to 93 of title 37,* C.R.S., *or Colorado court determi-*

*nations with respect to the determination and administration of water rights.*

§ 25–8–104(1) (emphasis added).[5] We read these provisions of the WCQA to allow the WCQA to work within the context of the prior appropriation system. *See City of Thornton v. Bijou Irr. Co.,* 926 P.2d 1, 66 (Colo.1996) (holding that the legislature clearly intended that authority over water quality not be exercised in a manner that significantly compromises the appropriative rights of present or future water users). Because the WQCA explicitly provides that it is not to interfere with the water court's role in adjudicating water rights, we conclude that the general assembly did not intend the WQCA to interfere with the water court's ability to protect senior water appropriators as set forth in sections 37-92-304(6) and 37-92-305(5).

■ The WQCA explicitly preserves the water court's authority over the question of injury to senior appropriators and the appropriate remedies for such injuries. Section 25–8–104 also provides:

Nothing in this article shall be construed, enforced, or applied so as to cause or result in material injury to water rights. The general assembly recognizes that this article may lead to dischargers choosing consumptive types of treatment techniques in order to meet water quality control requirements. Under such circumstances, the *discharger must comply with all of the applicable provisions of articles 80 to 93 of title 37,* C.R.S., *and shall be obligated to remedy any material injury to water rights* to the extent required under the provisions of articles 80 to 93 of title 37, C.R.S. *The question of whether such material injury to water rights exists and the remedy therefor shall be determined by the water court.*

§ 25–8–104(1) (emphasis added). We conclude from this provision that the water court's role in assessing injury and preserv-

---

5. Section 6 of article XVI of the Colorado Constitution recognizes the prior appropriation doctrine and the corresponding right to divert unappropriated waters of any natural stream to beneficial use. Colo. Const. art. XVI § 6. Section 5 of the constitution makes the unappropriated water of every natural stream within Colo-

rado the property of the people of the state. Colo. Const. art. XVI § 5. Chapters 80 through 93 of article 37 of the Colorado Revised Statutes concern various aspects of water rights. Relevant to the discussion here are the provisions of the WRDAA, §§ 37–92–101, *et seq.*

ing appropriators' water rights in augmentation plan proceedings remains intact despite the WQCC's role in protecting the quality of the state's waters.

## C. Water Court's Role Under WRDAA

The WRDAA explicitly requires the water court to consider water quality issues in the case of an augmentation plan in which water is being actively substituted into a stream for the use of other appropriators. *See* § 37–92–305(5); *Bijou Irr. Co.*, 926 P.2d at 66. The substituted water must be of a quality and continuity to meet the requirements for which the water of the senior appropriator has normally been used. § 37–92–305(5).

The WRDAA provides that the water court must approve an augmentation plan if it will not injuriously affect the owner of or persons entitled to use water under a vested water right or a decreed conditional water right. § 37–92–305(3).

Despite the general assembly's assignment of water quality issues to the WQCC, the language of the WQCA clearly expresses a legislative intent for water quality issues to remain within the purview of the water court as set forth in the WRDAA. *See* § 25–8–104(1). Section 25–8–104(1) explicitly states that the water court retains authority over the question of whether material injury to water rights exists and the remedy for such injury. *Id.* Injury occurs under the WRDAA where the water provided by an augmentation plan is not of a quality and quanity so as to meet the requirements for which the water of the senior appropriator has normally been used. *See* § 37–92–305(3), (5). The WRDAA and the WQCA therefore preserve the common law standard that the introduction of pollutants into a water supply constitutes injury to senior appropriators if the water is no longer suitable for the senior appropriator's normal use because of the substitute supply. *See* § 25–8–104(1).

This court has recognized that Colorado's division of responsibility over water matters between the water courts and the WQCA limits the ability of both the water court and water quality control agencies to address certain water quality control issues. *Bijou Irr. Co.*, 926 P.2d at 66. Nevertheless, the WQCA and the WRDAA guarantee the right of senior appropriators to a substitute water supply suitable for their normal use of the water prior to the implementation of the augmentation plan, despite the role of the WQCC over general water quality issues. § 25–8–104(1); 37–92–305(5).

## IV. Application

Thornton argues that the water court should have held proceedings on the need to modify Denver's Augmentation Plan, or in the alternative, extended the seven-year period of retained jurisdiction until the nature and extent of Thornton's injury from the use of Bi–City effluent could be determined in the Denver exchange case. Thornton alleges injury because the quality of the effluent actually produced by the Bi–City plant as a substitute supply makes the water unsuitable for Thornton's normal use of the water as a municipal water supply. Denver seeks to distinguish between our use of retained jurisdiction to address uncertainty in the water court's initial prediction of non-injury with regard to water quantity issues like the time, amount, and location of return flows, and a prediction of non-injury with regard to water quality. Denver bases its distinction on the existence of the WQCA and the WQCC's general authority over water quality and water pollution prevention.

Here, Thornton filed a petition within the seven-year period of retained jurisdiction provided by the decree. The petition alleged that "the use of Bi–City effluent has caused injurious water quality effects that include . . . increasing concentrations of phosphorous, nitrate and nitrite, harmful types of dissolved organic carbon, and microbiological contaminates." R. at 104. The petition continued, "there has been substantial evidence that Denver's use of Bi–City effluent as a substitute supply injures Thornton." R at 105. Thornton argued that resolution of the pending Denver exchange case involving water quality issues might reveal the terms and conditions necessary to prevent injury to Thornton in this case, at which time the water court could set any necessary further proceedings. Thornton requested that the water court extend the "period of retained

jurisdiction until the issue of injury to Thornton from Denver's use of Bi–City effluent as a substitute supply" could be resolved. *Id.*

In denying the petition, the water court focused on the following language in the petition: "The nature and extent of Thornton's injury from Denver's use of Bi–City effluent was not fully known when the decree was entered in this case ... Subsequently, however, the health effects of pollutants contained in Bi–City effluent have come to be better understood." *Id.* The court concluded that better understanding of the detrimental water quality effects of wastewater treatment plant effluent was not the type of injury the retained jurisdiction statute was designed to address. R. at 189. In denying the petition, the water court overlooked Thornton's allegations of the injurious water quality effects of using Bi–City effluent that allegedly contained increased levels of phosphorous, nitrate, nitrite, dissolved organic carbon, and microbiological contaminates.

The water court also misinterpreted the scope of Thornton's stipulation to the use of Bi–City effluent as part of Denver's Augmentation Plan. After initially objecting to the plan, Thornton stipulated that the "replacement water provided for under [Denver's] Plan for Augmentation [was] adequate to meet the lawful requirements of a senior diverter at the time and location and to the extent the senior would be deprived of his lawful entitlement by the Applicant's diversion." R. at 115–116. Thornton further agreed that Denver's Proposed Augmentation Plan "would not injuriously affect the owners of or persons entitled to use water under a vested water right or decreed conditional water right." R. at 115–116, 126–127.

■ The augmentation plan approved by the water court provided:

The replacement water provided for under this Plan for Augmentation is of a quality and quantity so as to meet the requirements for which water of the senior appropriator has normally been used, and such replacement water shall be accepted by the senior appropriator in substitution for water derived by the exercise of his decreed rights.

R. at 126. The language of the water court's decree tracks section 37–92–305(5), which governs the standard for suitability of replacement water utilized for augmentation plans. This language is more specific, but has essentially the same meaning as the language used in the proposed augmentation plan Thornton submitted with its stipulation. Accordingly, Thornton's stipulation concedes nothing more than what the water court would have determined in the first stage of the injury analysis at the time of the initial decree. *See* § 37–92–305(3) (requiring that a plan not injuriously affect persons entitled to use water under a vested water right). Therefore, it does not foreclose consideration of whether injury resulted from the operation of Denver's Augmentation Plan.

The legislature provided for both a determination of non-injury to senior appropriators at the time of the initial decree approving an augmentation plan, and a period of retained jurisdiction during which the water court could reconsider its initial determination of non-injury in light of the actual operation of the plan. *See* § 37–92–305; § 37–92–304(6). Although Thornton initially agreed that it would not be injured by the use of Bi–City effluent in Denver's Augmentation Plan, the stipulation governed only the water court's initial determination of non-injury to Thornton during the first stage of the injury analysis. The second stage of the injury analysis occurs later, once an augmentation plan becomes operational. The question of operational injury remained open for reconsideration at the second stage of the injury analysis under the retained jurisdiction provision. *See* 37–92–304(6); *Farmers Res. & Irr. Co.*, 33 P.3d at 805.

■ Because Thornton has an appropriative right to water, section 37–92–305(3) requires the water court or water referee to accept proposed terms or conditions designed to prevent injury to Thornton. § 37–92–305(3). If the substitute supply of water provided by Denver's Augmentation Plan renders the water supply Thornton receives unsuitable for Thornton's normal use of the water in comparison to the water it would otherwise receive at its point of diversion if Denver's Augmentation Plan had not been

instituted, Thornton's property right in the use of its water is impaired by the substitute supply. *See Brighton Ditch Co. v. City of Englewood,* 124 Colo. 366, 237 P.2d 116 (1951). Thus, prior to its approval of the augmentation plan, the water court properly determined that senior appropriators would not be injured based upon a prediction made at the decree's entry. § 37–92–305(5). Under the retained jurisdiction provision of the augmentation plan decree in this case, the authority to make the determination of injury to Thornton at the time of the operational stage of the augmentation plan remains with the water court notwithstanding the WQCA and the WQCC's general authority over water quality issues. *See* § 25–8–104(1); 37–92–305(5).

Retained jurisdiction protects Thornton by allowing the water court to reconsider its initial determination that Thornton and other senior appropriators would not be injured by Denver's Augmentation Plan. *See* § 37–92–304(6). This second stage of the water court's determination of non-injury is important because the water court cannot always predict the actual effects of an augmentation plan. *See Farmers Res. & Irr. Co.,* 33 P.3d at 805. In the interest of finality, the water court sets the period of retained jurisdiction at the period of time it finds necessary to preclude or remedy any injury that may emerge once the augmentation plan becomes operational. *Id.* at 806. The retained jurisdiction provision therefore provides the water court with flexibility to implement programs that maximize the beneficial use of water without sacrificing the vested water rights of Thornton and other senior appropriators. *City of Florence,* 793 P.2d at 157.

 Retained jurisdiction should be invoked where the actual operation of an augmentation plan reveals that substituted water is unsuitable for a senior appropriator's normal use of the water in comparison to the quality of the water it would otherwise receive at its point of diversion if the augmentation plan had not been instituted. *See* § 37–92–305(5). The water court read Thornton's petition as claiming injury from increased knowledge of the detrimental water quality effects of Bi–City effluent and overlooked the city's allegation that the actual operation of Denver's Augmentation Plan made the water Thornton receives at its diversion point unsuitable for Thornton's use of the water as a municipal water supply. Thornton's increased knowledge of potential health consequences of using Bi–City effluent as a replacement supply is important only to the extent that it aids in establishing the unsuitability of the water. The pivotal issue is the water's suitability. Thornton can use its increased knowledge to prove injury from Denver's Augmentation Plan only by demonstrating that the quality of the Bi-city effluent makes the water supply unsuitable for the city's normal use as a municipal water supply. Thornton's increased knowledge of the health consequences of using the effluent might demonstrate a decrease in water quality without proving the unsuitability of the effluent as a substitute water supply. Under such circumstances, Thornton would not be "injured" by Denver's Augmentation Plan. However, it is possible for Thornton to use its increased knowledge of the potential health consequences of using Bi–City effluent to convince the water court that the water supply it receives after the augmentation plan was put into place is unsuitable for Thornton's normal municipal use. It is the unsuitability of the water, rather than Thornton's understanding of possible health consequences of its use, that triggers the retained jurisdiction provision.

Water courts have a responsibility to protect the water rights of Thornton and other senior appropriators. § 37–92–305(3). This responsibility is very important because senior appropriators like Thornton must accept substituted water in replacement for water they would otherwise receive, so long as the replacement water is "of a quality and quantity so as to meet the requirements for which the water of the senior appropriator has normally been used." § 37–92–305(5).

When confronted with Thornton's claim of injury from the quality of the Bi–City effluent, the water court had an obligation to hold a hearing, with Thornton bearing the burden of going forward, to address the injury to Thornton as a result of the actual operation of Denver's Augmentation Plan in

comparison to the quality of supply it would receive absent the institution of the augmentation plan or, in the alternative, to extend the period of retained jurisdiction until the pending Denver exchange case could address the common water quality issues. Instead, the court found that the seven-year period of retained jurisdiction could not be invoked to address the quality effects of the use of Bi–City effluent as a substitute water supply in Denver's Augmentation Plan.

We determine that this case presents a situation in which the actual operation of Denver's Augmentation Plan creates a cognizable issue of injury to Thornton not anticipated by the water court at the time of its initial decree. The general responsibility of the WQCC over water quality issues does not change the retained jurisdiction analysis because the water court retains authority over injury determinations relating to water quality made pursuant to section 37-92-304(6) despite the WQCA. Similarly, Thornton's initial stipulation to the suitability of the Bi–City effluent did not preclude the water court from reconsidering potential injury to Thornton during the retained jurisdiction stage of its injury analysis. Accordingly, we hold that the water court improperly refused to hold a hearing on Thornton's alleged injury from the operation of Denver's Augmentation Plan or to extend the period of retained jurisdiction until the suitability of Bi–City effluent as a replacement supply could be determined in the pending Denver exchange case. The judgment of the water court is reversed and the case remanded to the water court for further proceedings consistent with this opinion.