Concerning the Application for Water Rights in the South Platte River or its Tributaries in Jefferson, Douglas, Arapahoe and Park Counties and the City and County of Denver.

BUFFALO PARK DEVELOPMENT COMPANY, a Colorado corporation; Colorado Mountain Properties, Inc., a Colorado Corporation; and Evergreen Memorial Park, Inc., a Colorado corporation, Applicants–Appellants:

v.

MOUNTAIN MUTUAL RESERVOIR COMPANY, a Colorado non-profit corporation; and North Fork Associates, LLC, Applicants–Appellees,

and

Bear Mountain Homeowners Association; Brook Forest Water District; Colorado Water Conservation Board; City and County of Denver, Acting by and Through its Board of Water Commissioners; City of Englewood; Evergreen Metropolitan District; Vista Exline; Farmers Reservoir and Irrigation Company; Foothills Metropolitan Recreation and Park District; Genesee Water and Sanitation District; Jefferson County Open Space Department; Henry L. Kerschbaum; City of Lakewood; Jere-

miah P. Lee; Ronald P. Lewis; Charles J. Maas; Town of Morrison; Ben Napheys; Larry J. Plume; Red Rocks Country Club; South Evergreen Water District; Theodore M. Zorich; and the Colorado Department of Water Resources, State and Division Engineers, Applicants–Appellees.

No. 06SA373.

Supreme Court of Colorado, En Banc.

Nov. 3, 2008.

As Modified on Denial of Rehearing Nov. 24, 2008.

Tienken & Hill, LLP, Alan G. Hill, Louisville, Attorneys for Applicant–Appellants.

Vranesh and Raisch, LLP, Michael D. Shimmin, Boulder, Attorneys for Opposers–Appellees.

David C. Lindholm, Boulder, Attorneys for Mountain Mutual Reservoir Company, and North Fork Associates.

Charles J. Maas, Evergreen, Ben Napheys III, Fort Ludlow, Henry L. Kerschbaum, Evergreen, Jeremiah P. Lee III, Evergreen, Vista Exline, Golden, Larry J. Plume, Evergreen, Opposers–Appellees, pro se.

Justice HOBBS delivered the Opinion of the Court.

This water case is now in its 15th year. It was filed in 1994 with an application for conditional water rights and an augmentation plan for 205 wells to be constructed in five Jefferson County mountain subdivisions in the Turkey Creek and Bear Creek sub-basins of the South Platte River Basin.

From the outset of the case, the owners of existing small capacity wells in the vicinity of three of the subdivisions, Mountain Park Homes, Bear Mountain Vista, and Cragmont subdivisions, asserted: (1) no unappropriated ground water remained available for appropriation by means of the newly-proposed subdivision wells, and (2) the proposed augmentation plan was fatally defective because it provided augmentation water only for surface water users and, thus, failed to prevent injury to the ground water users located between the newly-proposed wells and the surface waters of Turkey Creek and Bear Creek.

The District Court for Water Division No. 1 ("water court") tried the case in three evidentiary segments over the course of three years, on July 19–23, 1999, January 24–26, 2000, and August 28–30, 2002. On August 4, 2006, after entering a delay reduction order against the Applicants in the case, the water court issued its Order and Judgment approving the application for two of the five subdivisions, Buffalo Meadows and Homestead, and dismissing the application for the other three subdivisions, Mountain Park Homes, Bear Mountain Vista, and Cragmont.

On October 16, 2006, after a round of proposed adjustments to prior decree drafts, the water court issued its decree making the augmentation plan effective for two of the subdivisions, Buffalo Meadows and Homestead subdivisions, and disapproving the plan as to the other three subdivisions. The case then became final for purposes of appeal.

In this appeal Buffalo Park Development Company ("Buffalo Park") contends that, even if the water court were correct in finding that no unappropriated ground water was available for three of the subdivisions, it did not afford the developer an adequate opportunity to propose terms and conditions for an augmentation plan to protect the existing ground water users. It also contests the standing of the Bear Mountain Homeowners Association ("Bear Mountain Homeowners") to assert injury on behalf of its members.[1]

We reject these contentions. Based on the evidence in the record, we uphold the water court's findings of fact and conclusions of law that Buffalo Park did not meet its burden of proof. Buffalo Park did not prove: (1) the

---

1. The Applicants (collectively "Buffalo Park") raised the following issues on appeal: (1) The water court erred in determining that Buffalo Park must demonstrate that there is unappropriated ground water available underlying Bear Mountain Vista in the Turkey Creek basin, and underlying Cragmont and Mountain Park Homes in the Bear Creek basin; (2) The water court erred in determining that the terms and conditions in Buffalo Park's proposed plans for augmentation would not prevent material injury pursuant to section 37–92–305(8), C.R.S. (2008); (3) The water court erred in not allowing Buffalo Park to propose additional terms and conditions that would prevent injurious effects pursuant to section 37–92–305(3), C.R.S. (2008); (4) The water court erred in finding that Opposer Bear Mountain Homeowners Association had standing to raise injury issues in this case; (5) The water court erred in not allowing Buffalo Park to call adverse witnesses in the presentation of Buffalo Park's case-in-chief; (6) The water court erred in limiting Buffalo Park's expert witnesses' rebuttal.

existence of available unappropriated water for the conditional ground water rights it claimed for the Mountain Park Homes, Bear Mountain Vista, and Cragmont subdivisions, or, in the alternative, (2) a non-injurious augmentation plan sufficient to protect the vested ground water rights of small domestic well owners who divert from the aquifers between the proposed three subdivisions and the surface waters of Bear Creek and Turkey Creek.

Prior to the trial of this case, we had entered our decision in *Shirola v. Turkey Cañon Ranch Ltd. Liab. Co.*, 937 P.2d 739 (Colo.1997), in which we remanded the case to the water court. We held that the lowering of ground water levels was evidence of injury to existing small capacity ground water users and the developer failed to propose a plan to add augmentation water to the aquifer to prevent injury caused by its proposed new water use. Thus, the issues the opposers raise in the case now before us concerning Buffalo Park's augmentation plan were known to Buffalo Park and should have been anticipated by Buffalo Park in its trial preparation.

We find that, even though Buffalo Park had ample opportunity throughout the water court proceedings to introduce evidence and propose terms and conditions for an augmentation plan protective of the existing ground water users, it failed to do so. Buffalo Park complains on appeal that the water court did not afford it an adequate opportunity to propose additional protective augmentation plan terms and conditions and, if given another opportunity, it "may propose localized replacement of water, either by piping water, or other methods to augment or replace the 10 percent depletion described in the proposed decree." Buffalo Park did not make this proposal before the final decree. Yet, it nonetheless contends we must now order the water court to reopen its 15 year-old proceedings. We decline to do so, and uphold the water court's judgment.

**I.**

In its 1994 application, Buffalo Park claimed conditional ground water rights with an appropriation date of September 12, 1994, for 205 new wells for five subdivisions. It also proposed an augmentation plan utilizing surface water sources to provide replacement water into Turkey Creek and Bear Creek to protect against injury to surface water users, but included no provision for augmentation of the ground water aquifers between the new wells and the surface streams to protect the ground water users.

Numerous owners of decreed surface water rights in Turkey Creek, Bear Creek, and the South Platte River filed statements of opposition in the case. The following individuals filed statements of opposition opposing the Cragmont conditional ground water appropriations, on the basis of alleged impacts to small capacity wells: Diana L. Blake; George E. Gaul; Jeremiah P. Lee, III; Larry J. Plume; Henry L. Kerschbaum; Ben Napheys, III; and, through intervention motion granted by the water court, Vista Exline and Charles J. Maas.

Following the close of the statement of opposition period, the Bear Mountain Homeowners moved to intervene in opposition to the Bear Mountain Vista and Mountain Park Home conditional ground water appropriations, on the basis that its members in the affected area owned vested ground water rights that could be injured. The water court granted the motion and allowed Bear Mountain Homeowners to file its statement of opposition.[2] During pre-trial proceedings, Bear Mountain Homeowners filed its disclosure statement listing Bruce Kroeker as its expert ground water witness. Buffalo Park's disclosure statement listed Curtis Wells as its ground water expert witness.

At trial, Buffalo Park attempted to have Wells testify as an expert on the issue of whether unappropriated ground water was available for the Buffalo Park conditional ground water appropriations. Because Buffalo Park failed to make required pre-trial disclosures, the water court precluded Wells

2. The record shows that small capacity well owners timely filed to adjudicate their vested small capacity ground water rights, in connection with

maintaining their statements of opposition asserting injury.

from testifying. Counsel for Buffalo Park, two of the opposers' counsel, and the court engaged in the following dialogue concerning the Bear Mountain and Cragmont subdivisions:

Q. (MR. HILL) Mr. Wells, you're aware *it's an issue in this case as to whether there is unappropriated groundwater available to supply the 10 wells on Bear Mountain Vista and 100 wells on Cragmont.* Based on your table and research that you did and the opinions you've developed, is it your opinion to a reasonable degree of geological certainty that there is appropriate groundwater available in each of the two subdivisions for the plan that is proposed for the decree in this case?

MR. SHIMMIN: Objection, Your Honor—

MR. KRASSA: Objection.

MR. SHIMMIN: There is no such opinion contained in his disclosure.

THE COURT: Sustained.

(Emphasis added).

At trial, Homeowners' expert witness, Mr. Kroeker, delivered his opinion that there was no unappropriated ground water available for Buffalo Park's conditional appropriations. He relied on evidence of substantially falling water levels in existing wells that, in several instances, required the re-drilling of wells to a significantly greater depth. He also testified that injury would occur to the vested water rights of existing homeowners in the Bear Mountain area because Buffalo Park's augmentation plan did not provide the replacements necessary to protect existing users from depletions to the aquifer caused by Buffalo Park's ground water withdrawals:

A. (MR. KROEKER) What my opinion is, and in BM–59 says, that the water levels are falling, it's an indication that the sustainable yield is being exceeded, because of that, there's no unappropriated water, and because—similarly, because there's no direct replacement at that location being proposed, that the sources of replacement will not protect these wells from injury in this area.

Bear Mountain Exhibit 59, referred to above, summarizes Mr. Kroeker's conclusions and opinions regarding the lack of available unap-propriated ground water and the failure of the proposed augmentation plan to protect the existing ground water users:

1. The wells in the Bear Mountain area are completed in a fractured rock aquifer. The yields of individual wells are dependent upon the number of fractures intercepted by the well. Interconnections between fractures results in a regional aquifer system that responds to area-wide recharge to the aquifer and discharge from the aquifer.

2. Based upon available water level data from well permits and measurements in selected wells in the area surrounding the meadow, ground water levels in the Bear Mountain area have been declining over time. This is an indication that the sustainable yield of the aquifer is already being exceeded. A summary of ground water level data and information about area wells that have experienced problems is included as Table 1. The locations of the wells from which data were available are shown on the attached General Location Map.

3. Because the sustainable yield of the bedrock aquifer underlying the meadow is already being exceeded, *there is no unappropriated water available for the Applicant's proposed wells.*

4. *The augmentation plan proposed by the Applicant contemplates replacement of stream depletions with substitute water supplies that will be delivered to the Bear Creek and Turkey Creek drainages at locations downstream of Bear Mountain. No direct replacement for recharge to the rock aquifer underlying the Bear Mountain area is proposed. Although this proposed replacement location may be adequate for protecting downstream surface water rights from injury, it provides no protection for the existing ground water users at Bear Mountain. Therefore, the augmentation plan will injuriously affect surrounding wells.*

(Emphasis added).

Upon examination by Applicants' attorneys, Mr. Kroeker referred to well data from several exhibits to support his opinion that: (1) the available amount of recharge in the

area was not sufficient to offset depletions already being made from the aquifer, (2) significantly declining water levels demonstrated a ground water mining condition, and (3) no unappropriated water was available for the proposed new ground water appropriations:

Q. (MR. HILL) Mr. Kroeker, if I can kind of wrap it up in my own mind, the substance of your testimony today is that, is it accurate that it is your opinion that there is no unappropriated ground water for 10 wells for Tract C in Bear Mountain Vista?

A. Yes.

Q. And the basis for that opinion—is your opinion—basis for your opinion is the water level measurements that are summarized from Exhibits BM–40 through 58 or 59, the well permit files and Exhibit A–181, and other documents that support what the water levels were over time? I don't know that I named all the documents, but based on the water level modifications that we've gone over today?

A. Yes, and including the well permit information regarding the fact that some of these wells have been redrilled.

* * *

Q. (MR. LINDHOLM) You've drawn a conclusion based again primarily on the numbers that show up on Exhibit BM–62, that's the Tract C area in a ground water mining condition?

A. Yes.

Bear Mountain Homeowners' Exhibit 62 arrays well data for nineteen of the homeowners' wells in the affected area. This data set demonstrates that wells originally drilled to a depth of 200 to 300 feet were re-drilled to depths from 400 to 1,100 feet, and water levels in wells drilled as deep as 500 to 600 feet were continuing to decline significantly.

Buffalo Park's expert, Mr. Wells, admitted on cross-examination that he had no site specific evidence for his theory that precipitation was sufficient to supply both the existing wells and the proposed new wells of the two Bear Mountain subdivisions and the Cragmont subdivision. He also admitted that, if precipitation recharge was sufficient to exceed withdrawals, the existing wells should not be experiencing falling ground water levels.

In its August 4, 2006, Order and Judgment, the water court made the following findings of fact in dismissing Buffalo Park's conditional ground water appropriations for the Mountain Park Homes, Bear Mountain Vista, and Cragmont subdivisions. First, the court reiterated preliminary findings it made earlier in the case:

From the evidence presented at trial, the court draws the following inferences: 1. The overall water levels in the subject area have declined over time. 2. Sustainable yield no longer exists. 3. The existence of well to well interference cannot be inferred from the existing data. 4. The thickness and depth of the fractured aquifer has not yet been established.

The water court then proceeded to affirm some of its preliminary findings, delete others,[3] make new findings, and enter its conclusions of law. It found and determined that no unappropriated water was available for the conditional ground water rights claimed for three of the subdivisions:

The court reaffirms its findings in numbered paragraphs 1 and 2, above.

With respect to paragraph 3, above, the court affirms the factual accuracy of the finding, but now concludes that the finding is irrelevant to the Applicants' burden of proving water availability. Based upon the established principle that underground water is presumed to be tributary, i.e., hydrologically connected, to a stream sys-

---

3. In its July 2003 order, the water court preliminarily approved the application for conditional ground water appropriations, based on post-trial monitoring and retained jurisdiction provisions to be placed into the decree for an augmentation plan that might be designed in the future. However, as we discuss later in this opinion, the water court recognized correctly in its 2006 or-der that Colorado water law requires an applicant to show, at trial, the availability of unappropriated water in order to obtain a conditional decree for the appropriation it seeks, or, if unappropriated water is not available, an adequate augmentation plan to permit out-of-priority diversions to be made without injury to pre-existing rights.

tem, it follows that a hydrologic connection is presumed to exist between wells within the same drainage ... *[T]he burden is upon the Applicant to present sufficient site-specific evidence to rebut the presumptions of stream tributariness and well-to-well hydrologic connection.*

Similarly, the finding in numbered paragraph 4, above, while factually accurate, is legally irrelevant to Applicants' burden of proof.

Therefore, the court withdraws its (prior) finding that "there is water available for appropriation by Applicants, *if and only if* Applicant establishes that its pumping will not interfere with the adjudicated wells owned by residents in the BMHOA area[.]" That finding erroneously postpones the burden of proving water availability until after the decree is entered, yet it is the Applicants' burden to have proven water availability during trial. Instead, *the court now finds that the Applicant has failed to establish that there is unappropriated water available for its proposed wells.*

(Emphasis added).

Because no unappropriated water was available for three of the subdivisions and Buffalo Park failed to prove that its augmentation plan was non-injurious to ground water users affected by those three subdivisions, the water court ordered the dismissal of Buffalo Park's application in regard to the Mountain Park Homes, Bear Mountain Vista, and Cragmont subdivisions, but approved the application for the Buffalo Meadows and Homestead subdivisions. The court then directed Buffalo Park to prepare, circulate to the parties, and file an amended proposed decree that would effectuate the augmentation plan for the Buffalo Meadows and Homestead subdivisions.

Buffalo Park circulated a proposed decree. The water court then received comments from the other parties in the case, made further adjustments to the decree, and entered its final judgment on October 6, 2006.

In the period between August 4 and October 6, 2006, while the water court was in the process of finalizing its judgment, Buffalo Park made no motion or offer of proof to introduce additional evidence and include additional terms and conditions to its augmentation plan which would have adequately protected the vested small capacity ground water users affected by the Mountain Park Homes, Bear Mountain Vista, and Cragmont subdivisions.

We determine that the water court did not err in approving the application in regard to two of the subdivisions and dismissing it in regard to three of the subdivisions.

## II.

Based on the evidence in the record, we uphold the water court's findings of fact and conclusions of law that Buffalo Park did not meet its burden of proof. It did not prove: (1) the existence of available unappropriated water for the conditional ground water rights it claimed for the Mountain Park Homes, Bear Mountain Vista, and Cragmont subdivisions, or, in the alternative, (2) a non-injurious augmentation plan sufficient to protect the vested ground water rights of small capacity domestic well owners who divert from the aquifers between the proposed three subdivisions and the surface waters of Bear Creek and Turkey Creek.

We also find that Buffalo Park had ample opportunity throughout the water court proceedings to introduce additional evidence and propose terms and conditions for an augmentation plan protective of the existing ground water users, and failed to do so. On appeal, Buffalo Park complains that the water court did not afford it an adequate opportunity to propose additional protective augmentation plan terms and conditions and, if given another opportunity, it "may propose localized replacement of water, either by piping water, or other methods to augment or replace the 10 percent depletion described in the proposed decree." Buffalo Park did not make this proposal before the final decree. Yet, it nonetheless contends that we now must order the water court to re-open its 15 year-old proceedings. We decline to do so.

Accordingly, we uphold the water court's judgment.

## A.

### Standard of Review

 Whether an applicant has met the legal standards for a conditional appropriation presents mixed questions of fact and law that we review de novo. *Pagosa Area Water and Sanitation Dist. v. Trout Unlimited,* 170 P.3d 307, 313 (Colo.2007). We defer to the water court's findings of fact if the evidence supports them. *City of Black Hawk v. City of Cent.,* 97 P.3d 951, 956 (Colo.2004). The sufficiency, probative effect, and weight of the evidence before the water court, together with the inferences and conclusions to be drawn therefrom are for the water court's determination. *Gibbs v. Wolf Land Co.,* 856 P.2d 798, 801 (Colo.1993). We will not disturb these determinations unless they are so clearly erroneous as to find no support in the record. *Id.*

## B.

### Water Availability and Augmentation Statutory and Case Law Applicable to this Case

The primary statutory provisions applicable to this case are those addressing augmentation plans and the "can and will" statute applicable to the availability of unappropriated water for a conditional appropriation.

### 1. Available Unappropriated Water

Section 37–92–305(9)(b), C.R.S. (2008), relating to conditional water rights provides:

No claim for a conditional water right may be recognized or a decree therefore granted except to the extent that it is established water can be and will be diverted, stored, or otherwise captured, possessed, and controlled and will be beneficially used and that the project can and will be completed with diligence and within a reasonable time.

 We have construed this statute to contain, among other elements, a threshold requirement that an applicant claiming the existence of unappropriated water for its conditional appropriation must prove this assertion. The plain language of section 37–92–305(9)(b), C.R.S. (2008), precludes a "wait and see" approach by applicants who assert that conditions may change and meteorological changes will increase the availability of water. *Se. Colo. Water Conservancy Dist. v. City of Florence,* 688 P.2d 715, 717–18 (Colo. 1984).

 The applicant must prove that unappropriated water is available based upon conditions existing at the time of the application, in priority, in sufficient quantities, and on sufficiently frequent occasions to enable the applicant to complete the appropriation with diligence and within a reasonable time. *Bd. of Arapahoe County Comm'rs v. United States,* 891 P.2d 952, 962 (Colo.1995). The calculation of unappropriated water availability should be based on the historic beneficial use of perfected water rights. *Id.* at 971.

 The function of a conditional water right decree is to reserve a priority date for an appropriation of water, until the appropriator perfects the appropriation by putting the unappropriated water to a beneficial use. Thus, a conditional appropriation is subject to subsequent findings of due diligence until such time as the appropriation is perfected by use and confirmed by an absolute decree. *Dallas Creek Water Co. v. Huey,* 933 P.2d 27, 34 (Colo.1997).

 At trial, the applicant's case-in-chief may require the presentation of expert testimony concerning the interaction of the proposed tributary ground water pumping on previously decreed and exercised ground water rights, as well as on surface water rights. The water court may exclude the applicant's evidence of water availability on the basis of untimely pre-trial disclosure regarding expert testimony in the case. *City of Aurora ex rel. Util. Enter. v. Simpson,* 105 P.3d 595, 615 (Colo.2005); *see also Simpson v. Cotton Creek Circles, LLC,* 181 P.3d 252, 261 (Colo. 2008). We will not overturn the water court's exercise of discretion to exclude the evidence, unless manifestly erroneous. *City of Aurora ex rel. Util. Enter.,* 105 P.3d at 615.

### 2. Augmentation Plans

Section 37–92–305(3)(a), C.R.S. (2008), relating to augmentation plans provides in pertinent part:

A change of water right, implementation of a rotational crop management contract, or *plan for augmentation,* including water exchange project, *shall be approved if such ... plan will not injuriously affect the owner of or persons entitled to use water under a vested water right or a decreed conditional water right.* In cases in which a statement of opposition has been filed, the applicant shall provide to the referee or to the water judge, as the case may be, a proposed ruling or decree to prevent such injurious effect in advance of any hearing on the merits of the application, and notice of such proposed ruling or decree shall be provided to all parties who have entered the proceedings. *If it is determined that the proposed change, contract, or plan as presented in the application and the proposed ruling or decree would cause such injurious effect, the referee or the water judge, as the case may be, shall afford the applicant or any person opposed to the application an opportunity to propose terms or conditions that would prevent such injurious effect.*

(Emphasis added).

Section 37–92–305(5), C.R.S. (2008), provides in pertinent part:

In the case of plans for augmentation including exchange, the supplier may take an equivalent amount of water at his point of diversion or storage if such water is available without impairing the rights of others.

Section 37–92–305(8), C.R.S. (2008), provides in pertinent part:

*In reviewing a proposed plan for augmentation and in considering terms and conditions that may be necessary to avoid injury,* the referee or *the water judge shall consider the depletions from an applicant's use or proposed use of water, in quantity and in time, the amount and timing of augmentation water that would be provided by the applicant, and the existence, if any, of injury to any owner of or persons entitled to use water under a vested water right* or decreed conditional water right. A plan for augmentation shall be sufficient to permit the continuation of diversions when curtailment would otherwise be required to meet a valid senior call for

water, to the extent that *the applicant shall provide replacement water necessary to meet the lawful requirements of a senior diverter at the time and location and to the extent the senior would be deprived of his or her lawful entitlement by the applicant's diversion....* Said terms and conditions shall require replacement of out-of-priority diversions that occur after any groundwater diversions cease.

(Emphasis added).

██ Pursuant to section 37–92–305(3), (5) & (8), C.R.S. (2008), the applicant's proposed plan of augmentation must be designed and operated to allow the applicant to make out-of-priority diversions through its proposed well or surface water diversions without injury to the pre-existing vested water rights of others. The applicant's evidence must be sufficient to enable the water court to consider the amount and timing of the applicant's depletions, the amount and timing of legally-available replacement water, and lack of injury to vested appropriations. *City of Aurora ex rel. Util. Enter.,* 105 P.3d at 615; *Lionelle v. Se. Colo. Water Conservancy Dist.,* 676 P.2d 1162, 1166 (Colo.1984).

██ The augmentation plan must identify the diversion structures, the uses to be augmented, and the source and amount of legally available replacement water to replace the depletions. *City of Aurora ex rel. Util. Enter.,* 105 P.3d at 615–16. An objector to an augmentation plan need not show an injury to a specific water right; injury to senior appropriators in general is enough. *City of Thornton v. City & County of Denver ex rel. Bd. of Water Comm'rs,* 44 P.3d 1019, 1025 (Colo.2002).

██ The applicant for an augmentation plan bears the initial burden of producing sufficient evidence at trial to establish a prima facie case that the proposed depletion will be non-injurious. "Before an applicant can establish an absence of injury to satisfy its prima facie case, it must first establish the timing and location of depletions, as well as the availability of replacement water to prevent injury from those depletions." *City of Aurora ex rel. Util. Enter.,* 105 P.3d at 615. If the applicant successfully meets its

burden, the objector bears the burden of providing evidence of injury to existing water rights. *Id.* at 614. Where objectors provide contrary evidence of injury, the applicant has the ultimate burden of showing an absence of injurious effect by a preponderance of the evidence. *Id.* at 614–15. Introduction of reliable evidence of the quantity, time, and location of depletions and the legal availability of replacement water is the responsibility of the applicant and cannot be postponed to occur under retained jurisdiction. *Id.* at 616–17. If the applicant does not meet its burden of proving the absence of injurious effect and the adequacy of its augmentation plan, the water court must dismiss the application. *Id.* at 616. "Retained jurisdiction cannot substitute for the inherently fact-specific determination of non-injury that occurs during trial based on reliable evidence of the quantity, time, and location of depletions and the legal availability of replacement water." *Id.* Appropriators of tributary ground water are entitled to protection for their appropriations, as are surface water appropriators. *City of Thornton v. Bijou Irrigation Co.,* 926 P.2d 1, 80–82 (Colo.1996). In overappropriated aquifer/surface water systems, Colorado law presumes that the proposed conditional depletions of tributary ground water by well pumping will result in material injury to other appropriators utilizing the same water source. *City of Aurora ex rel. Util. Enter.,* 105 P.3d at 607. The applicant has the burden of proof to offer evidence that no material injury will result before the court approves the augmentation plan.[4] *Id.*

### 3. Relationship Between Conditional Water Rights and Augmentation Plans

■ The appropriation of tributary ground water is subject to the doctrine of prior appropriation, as is the appropriation of surface water.[5] *Empire Lodge Homeowners' Ass'n v. Moyer,* 39 P.3d 1139, 1147 (Colo. 2001); *City of Thornton,* 44 P.3d at 1025. The right of appropriation guaranteed by sections 5 and 6, article XVI, of the Colorado Constitution and section 37–92–102(1)(a), C.R.S. (2008), of the 1969 Water Right Determination and Administration Act is a right "to the appropriation of unappropriated waters . . . not to the appropriation of appropriated water." *Id.* Section 6 of Article XVI provides: *"The right to divert the unappropriated waters of any natural stream to beneficial uses shall never be denied."* (Emphasis added). Pursuant to section 37–92–103(6.3), C.R.S. (2008), a "conditional water right" is "a right to perfect a water right with a certain priority upon the completion with reasonable diligence of the appropriation upon which such water right is to be based."

Like a ditch, a well is a diversion device for obtaining water in connection with a beneficial use. The construction of a well requires a State Engineer-issued well permit pursuant to section 37–90–137(1) of the Ground Water Management Act. The grant or denial of a well permit does not adjudicate the status of any water right associated with the well; this jurisdiction belongs exclusively to the water court, pursuant to section 37–92–203, C.R.S. (2008).

■ If unappropriated water is not available for appropriation, an adequate augmentation plan allows diversions in areas where they would not be possible otherwise. The applicant for an augmentation plan bears the burden of proof at trial, and thus must present evidence that the augmentation plan will abate any injury that results from its pro-

---

4. The South Platte Basin, which includes tributary ground water of the sub-basins, at issue in this case, is substantially over-appropriated in many areas. *City of Aurora ex rel. Util. Enter.,* 105 P.3d at 607; *Wadsworth v. Kuiper,* 193 Colo. 95, 98, 562 P.2d 1114, 1115 (1977). The application in this case recognized the over-appropriated status of the Bear Creek and Turkey Creek sub-basins as to surface water rights but did not address the existing ground water rights between the proposed new wells and the surface streams.

5. Colorado law includes a presumption that all ground water is tributary to and subject to appropriation and administration as part of the waters of a surface stream, unless a person proves by clear and satisfactory evidence that the ground water is not tributary. *Safranek v. Town of Limon,* 123 Colo. 330, 333, 228 P.2d 975, 976 (1951).

posed diversion.[6] *City of Aurora ex rel. Util. Enter.*, 105 P.3d at 615; *Simpson v. Bijou Irrigation Co.*, 69 P.3d 50, 60–61 (Colo.2003). An augmentation plan is a statutory device for allowing a water diversion structure, such as a ditch or well, to operate out of priority; in contrast to conditional and absolute water rights, augmentation plan decrees do not depend upon or assign priority dates. *Empire Lodge Homeowners' Ass'n*, 39 P.3d at 1155.

#### 4. Small Capacity Vested Domestic Water Rights

██ Any person or organization may maintain a statement of opposition for the purpose of holding the applicant for a conditional water right to a standard of strict proof. *Shirola*, 937 P.2d at 747. In addition, ground water appropriators for small capacity domestic water wells hold vested water rights pursuant to section 37–92–602(3)(b)(II)(A), C.R.S. (2008). These vested water rights are entitled to protection when new conditional water rights or augmentation plans are proposed, independent of whether their owners adjudicate the water rights. *Id.* at 752.

In an effort to protect small agricultural and domestic water users, the General Assembly has created a statutory category for exempt small capacity ground water rights that differ from all other water rights. *Id.* at 749–50. When issuing permits for small capacity ground water wells for domestic use under section 37–92–602(3)(b)(II)(A), C.R.S. (2008), where the return flow from the single family residential household use is returned to the same stream system in which the well is located, the State Engineer is entitled to presume that this use will not materially injure the vested water rights of others. However, pursuant to section 37–92–602(3)(b)(III), C.R.S. (2008), this presumption does not apply to subdivision ground water appropriations proposed after June 1, 1972. *Id.* at 752.

██ Thus, the owners of small capacity ground water wells hold vested ground water rights, obtained when they complete their wells and put the ground water to beneficial use. They are exempt from having to apply to the water court for recognition of their water rights and from priority administration by the water officials. Yet, they are entitled to protection of their water rights when new conditional ground water uses or augmentation plans are proposed pursuant to the 1969 Act and the well permit provisions of the Groundwater Management Act. *Id.* at 749–52.

Section 37–90–137(2)(b)(I), C.R.S. (2008), provides that the State Engineer must make four findings before granting a permit application to construct a well: (1) *there is unappropriated water available*, (2) the vested water rights of others will not be materially injured, (3) hydrological and geological facts substantiate the proposed well, and (4) the proposed well will be located over 600 feet from any other existing wells. (Emphasis added). Otherwise, the State Engineer must deny the well permit application. *Shirola*, 937 P.2d at 752. Pursuant to section 37–92–305(6)(a), C.R.S. (2008), the water court must accord presumptive validity to the State Engineer's well permit findings. *Danielson v. Jones*, 698 P.2d 240, 248–49 (Colo.1985).

In lieu of applying for a well permit first, an applicant may elect to file a conditional water right application and/or an augmentation plan application directly with the water court. As the State Engineer must determine whether there is unappropriated water available to supply the proposed new ground water diversion, so must the water court. Pursuant to section 37–92–305(9)(b), C.R.S. (2008), the water court determines whether the applicant claiming the availability of unappropriated water has proved at trial that there is unappropriated water available for appropriation. If not, the court determines pursuant to section 37–92–305(3),(5) & (8), C.R.S. (2008), whether the applicant has proposed and proved an adequate augmentation plan the operation of which, in accordance with the water court's decree including pro-

---

6. Because unappropriated water may be available for diversion and use by the applicant part of the time, but not at all times desired, applications for conditional water rights are often combined with applications for augmentation plans, in order to address situations where diversion and use would be made out-of-priority.

tective terms and conditions, will prevent material injury to vested water rights or decreed conditional water rights.

In cases where a statement of opposition has been filed to an applicant's augmentation plan, the applicant must provide the water court a proposed ruling or decree to prevent injurious effect to a vested water right or a decreed conditional water right prior to any hearing on the merits of the application. § 37–92–305(3), C.R.S. (2008).

 The owner of a vested small capacity ground water right may contest the adequacy of a proposed subdivision well augmentation plan through a statement of opposition in the case, and file for adjudication of his or her in-house residential ground water right's antedated priority date. *Shirola*, 937 P.2d at 754.

### C.

### Application to This Case

We turn first to Buffalo Park's contention that Bear Mountain Homeowners lacks standing in this case on the issue of injury to the vested ground water rights of its members who hold such rights. Then, we discuss the availability of unappropriated water and the augmentation plan issues, resulting in our conclusion that the water court properly dismissed Buffalo Park's application for conditional water rights and approval of an augmentation plan in regard to three of the subdivisions.

### 1. Standing of Bear Mountain Homeowners

 The water court granted Bear Mountain Homeowners' motion to intervene in this case and allowed it to file a statement of opposition, based on its associational interest in protecting the interests of its members who own vested small capacity domestic ground water rights. We agree with the association that it has standing in this case to hold Buffalo Park to its strict burden of proving: (1) that unappropriated ground water is available for its proposed conditional ground water appropriations, and (2) because members of the association filed for adjudication of their vested water rights, that the proposed augmentation plan is non-injurious to the vested ground water rights of its members.

In *Shirola*, we recognized that standing to file statements of opposition is founded upon at least two sections of the 1969 Act. 937 P.2d at 747. First, is section 37–92–302(1)(b), C.R.S. (2008), which allows any "person" to file a statement of opposition to a water application in order to hold the applicant to a standard of strict proof. Second, is section 37–92–305(3), C.R.S. (2008), which provides that the referee or water judge shall afford any "person" opposed to the application an opportunity to propose terms or conditions that would prevent injurious effect to a vested water right or a decreed conditional water right. *Id.*

These two statutory sections reflect the overarching principle of Colorado water law, embodied in Article XVI, section 5, of the Colorado Constitution, that the water of every natural stream, including surface water and tributary ground water, is the property of the public and is dedicated to the use of the people subject to appropriation. *Id.* at 747–48. Allowing broad standing for "persons" to appear in opposition to an application brings to the water court facts and arguments that aid water referees and judges in carrying out their public roles, allowing them to make informed rulings and judgments concerning allocation, use, and administration of the public's water resource.

Section 37–92–103(8), C.R.S. (2008), of the 1969 Act defines "person" to mean "an individual, a partnership, a corporation, a municipality, the state of Colorado, the United States, or any other legal entity, public or private." This comprehensive definition encompasses a homeowners' association that seeks, on behalf of its well-owning members, to hold a subdivision applicant to its burden of proof regarding the availability of unappropriated water and, if unappropriated water is not available and members of the association have filed for adjudication of their water rights, the adequacy of the applicant's augmentation plan to protect its members' vested ground water rights against injury.

In the case before us, seventeen members of Bear Mountain Homeowners affected by the Mountain Park Homes and Bear Mountain Vista subdivisions, and four individuals affected by the Cragmont subdivision, filed for adjudication of their small capacity wells in connection with asserting their injury issues. A homeowners' association's representational standing to assert the injury that its members could assert individually is supported by United States Supreme Court jurisprudence, as well as the jurisprudence of our state. *See United Food and Commercial Workers Union Local 751 v. Brown Group, Inc.*, 517 U.S. 544, 552, 116 S.Ct. 1529, 134 L.Ed.2d 758 (1996); *Heritage Vill. Owners Ass'n v. Golden Heritage Investors, Ltd.*, 89 P.3d 513, 515 (Colo.App.2004); *Consestoga Pines Homeowners' Ass'n, Inc. v. Black*, 689 P.2d 1176, 1177 (Colo.App.1984)(citing *Hunt v. Washington State Apple Advertising Commission*, 432 U.S. 333, 97 S.Ct. 2434, 53 L.Ed.2d 383 (1977)(recognizing that an association may have representative standing when: "(a) its members would otherwise have standing to sue in their own right; (b) the interests it seeks to protect are germane to the organization's purpose; and (c) neither the claim asserted, nor the relief requested, requires the participation of individual members in the lawsuit")).

Thus, in regard to both prongs of the *Shirola* standing criteria, the water court did not err in allowing Bear Mountain Homeowners to intervene in this case and maintain its statement of opposition based on the unavailability of unappropriated water and an injurious augmentation plan.

### 2. Lack of Available Unappropriated Water

 It is clear from the application Buffalo Park filed in this case, the evidence it presented at trial, and the arguments it made after trial that it was claiming that unappropriated ground water was available for its new wells. Based on evidence in the record in the case before us, the water court found that unappropriated water was not available for the proposed conditional ground water appropriations of three subdivisions, Mountain Park Homes, Bear Mountain Vista, and Cragmont subdivisions. As summarized in part I of this opinion, this evidence demonstrated that existing small capacity wells with vested ground water rights are presently being operated in aquifers hydraulically connected to Turkey Creek and Bear Creek and could be injured by the operation of the proposed new wells.

Buffalo Park had the burden of proving at trial the availability of unappropriated ground water in the Turkey Creek and Bear Creek aquifers for the conditional ground water appropriations it claimed in its application. *Bd. of Arapahoe County Comm'rs*, 891 P.2d at 962; *Se. Colo. Water Conservancy Dist.*, 688 P.2d at 717–18. It failed to carry this burden. At trial, it belatedly sought to introduce the opinion of an expert that unappropriated ground water was available for its proposed appropriations, but the water court properly precluded that testimony for lack of timely pre-trial disclosure. *City of Aurora ex rel. Util. Enter.*, 105 P.3d at 610–12 (declining to overturn a water court's evidentiary ruling that precluded expert testimony because of the applicant's failure to make necessary disclosures).[7]

Thus, the only expert evidence in the record concerning the issue of unappropriated ground water availability is that of the opposers, whose expert testified that: (1) existing wells in the affected area have experienced significant water level declines, (2) existing well owners have had to drill and re-drill their wells to great depths, (3) precipitation infiltrating the aquifer system is not sufficient to recharge the ground water system in the affected area under existing conditions of use, (4) the ground water system in the affected area is experiencing a mining condition, and (5) there is no unappropriated water available in the affected area for the proposed subdivision appropriations. Exhib-

---

7. Buffalo Park's evidence was that 3% of the precipitation in the area infiltrated the aquifers and the subdivision wells would be drawing on such infiltration. Buffalo Park's evidence did not address or counter, in any way, Bear Moun-tain Homeowners' evidence that this limited amount of aquifer recharge is necessary to supply the existing wells in a system that is experiencing significantly declining water levels and a mining condition.

its in evidence and the testimony of individual existing well users in the case also support the conclusion that there was no unappropriated water available in the affected area of the three subdivisions.

Buffalo Park's counsel argued repeatedly in oral argument that unappropriated ground water was available for the proposed wells and a conditional ground water right should be awarded with a 1994 date. This argument was based on the theory that precipitation was sufficient to supply both the existing wells and the proposed new wells, but Buffalo Park's expert witness admitted that, if precipitation recharge was sufficient to exceed withdrawals, then the existing wells should not be experiencing falling ground water levels.

Because evidence in the record supports the water court's finding that unappropriated water is not available for the proposed conditional ground water appropriations of the Mountain Park Homes, Bear Mountain Vista, and Cragmont subdivisions, we will not disturb its findings of fact. We defer to the water court's findings of fact if the evidence supports them unless they are so clearly erroneous as to find no support in the record. *City of Black Hawk*, 97 P.3d at 956.

We conclude that the water court's order precluding the untimely-proffered expert opinion on the availability of unappropriated water is not an abuse of discretion, and its order dismissing Buffalo Park's conditional water right application for a decree to unappropriated ground water is not erroneous because Buffalo Park failed to meet its burden of proof in regard to three of the subdivisions.

### 3. The Failed Augmentation Plan for the Three Subdivisions

Buffalo Park put at issue the existence of both unappropriated water and the adequacy of its augmentation plan to prevent injury to all affected vested water rights. Good preparation, including good engineering and legal work, are necessary in cases like the one before us if the applicant is going to meet its burden of proof in regard to its claims. At trial, Buffalo Park had the burden of proving a non-injurious augmenta-

tion plan that would allow for out-of-priority diversions if unappropriated water was not available for appropriation. *City of Aurora ex rel. Util. Enter.*, 105 P.3d at 615; *Lionelle*, 676 P.2d at 1166. In our 1997 *Shirola* opinion we addressed the issue of whether injury to the vested small capacity ground water wells "would be abated by augmentation water." 937 P.2d at 739. In that case, the trial court disallowed the owners of vested small capacity ground water wells to assert injury on the basis of a lack of augmentation water. We reversed and remanded, emphasizing that the proponent of the subdivision in that case had not proposed to add augmentation water to the aquifer: "The important issue is that no augmentation water will be added to the Manitou formation itself." *Id.* at 753. In doing so, we observed that the small capacity ground water users were alleging a lowering of the static water level, to their injury, and we directed the water court to reopen the proceeding to address their prima facie showing on the "principal issue ... of injury." We said that on remand, "the water court is to determine whether Turkey Cañon's application for conditional rights, together with a plan for augmentation, will injuriously affect the objectors' exercise of their vested water rights." *Id.* at 755. Finally, we said that the "water court may consider whether the objectors themselves are exercising their rights efficiently." *Id.*

The evidentiary proceedings in this case occurred in 1999 and 2002. Before then, our *Shirola* decision had addressed the ability of small capacity well owners to assert injury on the basis of a lowering of the static ground water level and to oppose an augmentation plan application that did not include providing replacement water to the aquifer. *Id.* at 739. Nevertheless, Buffalo Park chose to base its ground water case on the claim that unappropriated ground water was available for appropriation because precipitation recharge was sufficient to satisfy the existing and the new well users. Bear Mountain Homeowners' expert introduced evidence to the contrary, and the water court agreed that no unappropriated ground water was available for appropriation in the affected areas.

Buffalo Park's augmentation plan proposal centered on protecting surface water users. It proposed no augmentation water to protect the vested ground water rights in the vicinity of the Mountain Park Homes and Bear Mountain Vista subdivisions. Its plan for the Cragmont subdivision was based on precipitation and septic return flows being sufficient to replace depletions to the existing wells. It made no evidentiary showing about the timing and amount of depletions and the sufficiency of legally available replacement water, in time and amount, to alleviate injury to the vested ground water rights of the existing well owners in the face of evidence that precipitation infiltrating into the aquifer could not be intercepted without causing injury to existing rights.

Thus, Buffalo Park's evidence did not meet the legal standards for a non-injurious augmentation plan in connection with proposed new ground water diversions, set forth in *City of Aurora ex rel. Util. Enter.*, 105 P.3d at 614–16. In contrast, the opposers produced evidence, summarized in part I of this opinion, that the proposed wells for these three subdivisions would materially injure the vested ground water rights of existing home owners. Although section 37–92–305(3), C.R.S. (2008), allows an applicant to propose terms and conditions for an augmentation plan decree necessary to protect against injury to existing vested water rights and conditional water rights, this provision assumes that the applicant bears its burden of proving the amount and timing of depletions from its proposed new diversions and the amount and timing of replacement water from legally available sources to remedy the injurious impact of those depletions upon pre-existing vested rights.[8] This proof cannot be postponed for determination later under retained jurisdiction. *City of Aurora ex rel. Util. Enter.*, 105 P.3d at 616–17.

▮ As we pointed out in *Shirola*, 937 P.2d at 744, Colorado water law requires that ground water appropriators employ a reason-able means of diversion. They cannot simply drill a shallow well and command the aquifer. *Colorado Springs v. Bender*, 148 Colo. 458, 462, 366 P.2d 552, 555 (1961). In the present case, Buffalo Park did not demonstrate that homeowners in the area had drilled only to unreasonably shallow depths. To the contrary, the evidence shows that existing wells were drilled to considerable depths or have been re-drilled to such depths.

### 4. Buffalo Park's Failure to Propose Adequate Augmentation Plans and Conditions before Water Court Final Judgment

▮ Section 37–92–305(3),(5) & (8), C.R.S. (2008), allows the applicant the opportunity to propose adequate terms and conditions to prevent injury to vested water rights and conditional water rights. Following the conclusion of the third evidentiary hearing in 2002, the water court ruled in July of 2003, that the application did not contain sufficient terms and conditions to protect the rights of the well owners, and ordered Buffalo Park to "include terms and conditions to protect vested rights that might be injured by the pumping." Buffalo Park delayed for 19 months before submitting a revised proposed decree. The water court found that Buffalo Park, in submitting the revised decree, substituted findings that it "believed to be correct, but which are at variance with the court's findings." The water court entered a delay reduction order that the court itself acknowledged was long overdue. In seeking to bring this case to resolution, the court acknowledged that it also bore responsibility for the delay.

The court acknowledged that it had contributed to the delay by not finding earlier in the case that unappropriated water was not available for Buffalo Park's proposed conditional ground water appropriations which would supply the Mountain Park Homes, Bear Mountain Vista, and Cragmont subdivi-

---

8. Buffalo Park asserts that the water court abused its discretion in refusing to allow it to call its expert to testify as part of Buffalo Park's case-in-chief and present certain rebuttal evidence. However, it appears from the record that Buffalo Park did not adequately prepare its case-in-chief to meet its burden of proof in this case, and the water court did not abuse its discretion when excluding evidence at trial. *See* C.A.R. 28(a)(4); *see also In re Hays' Estate*, 127 Colo. 411, 412–13, 257 P.2d 972, 973 (1953).

sions.[9] The water court made this finding on August 4, 2006. It also found that the application for the Buffalo Meadows and Homestead subdivisions was sufficient because "the Applicant's augmentation plan, as applied to these areas, will replace 100% of their depletions." However, it dismissed the application for the Mountain Park Homes, Bear Mountain Vista, and Cragmont subdivisions as insufficient.

Buffalo Park complains on appeal that the water court did not afford it an adequate opportunity to propose additional protective augmentation plan terms and conditions and, if given another opportunity, it "may propose localized replacement of water, either by piping water, or other methods to augment or replace the 10 percent depletion described in the proposed decree." However, it did not make this proposal while the case was pending before the final decree. Compounding its failure to propose and prove a sufficient augmentation plan with such components between the filing of this case in 1994 up to August 4, 2006, was Buffalo Park's failure to make any motion or offer of proof to introduce additional evidence and provide the necessary additional protective terms prior to entry of the October 6, 2006, decree.

Having wrestled this case to exhaustion since its filing in 1994, Buffalo Park surely could have made such a proposal if it had one to make. Until the water court entered its decree approving the augmentation plan for two of the subdivisions, no final judgment had been entered.

As a trial court, the water court is not an advocate and need not serve as counsel to either party. *See People v. Garcia*, 28 P.3d 340, 344 (Colo.2001). A party to a water case, believing that it has not been offered an adequate opportunity to propose protective terms and conditions under section 37–92–305(3), has a responsibility to alert the water judge of its position in this regard, and make a motion or offer of proof to introduce evidence and protective terms and conditions for an adequate augmentation plan while the case is still pending in the water court. Section 37–92–305(8), C.R.S. (2008), requires that a sufficient evidentiary basis exist in the record to enable the water court to consider and decree an augmentation plan that provides "the replacement water necessary to meet the lawful requirements of a senior diverter at the time and location and to the extent the senior would be deprived of his or her lawful entitlement by the applicant's diversion;" the terms and conditions of the decree "shall require replacement water of out-of-priority depletions that occur after any ground water diversions cease."

The water court did not err in finally bringing this 15–year old case to an end. On appeal, we will not provide Buffalo Park yet another opportunity to revisit the adequacy of its proof and augmentation plan in this case.[10]

### III.

Accordingly, we affirm the water court's judgment.

Justice COATS dissents, and Justice EID joins in the dissent.

JUSTICE COATS, dissenting.

I dissent from the majority's opinion and judgment, not because I believe the applicants actually proved the availability of unappropriated water, but because I believe the water court nevertheless erred in denying their demand to propose additional terms and conditions to prevent any injurious ef-

---

9. The water court, as any other trial court, may correct its own erroneous legal conclusion prior to a final judgment in the case. The law does not encourage erroneous judgments. *Giampapa v. Amer. Family Mut. Ins. Co.*, 64 P.3d 230, 243 (Colo.2003). Here, the water court recognized that the availability of unappropriated water for the proposed conditional water right is a threshold question for which the applicant bears the burden of proof at trial. It therefore rescinded its preliminary approval for a ground water mon-

itoring program to ascertain the availability of unappropriated water and the adequacy of the augmentation plan under the aegis of retained jurisdiction.

10. Our opinion does not prevent Buffalo Park from filing an application for an adequate augmentation plan in the future for the three subdivisions. An augmentation plan is not dependent on obtaining a conditional decree for the appropriation of unappropriated water.

fects that might result from their application. Beyond erroneously depriving the applicants of at least fourteen years of seniority, the water court's outright dismissal betrays a fundamental misconception about the relationship between the availability of unappropriated water (proof of which we have held to be necessary to acquire conditional water rights) and the absence of injury to senior appropriators (proof of which is necessary for approval of an accompanying augmentation plan).

More particularly, I believe the water court's ruling demonstrates a failure to appreciate, especially in the context of tributary ground water, what it means for unappropriated water to be "available." Although at first glance, my quarrel with the majority may appear to involve little more than a disagreement over the procedure by which an applicant may invoke its statutory right to propose additional augmentation conditions, I believe this dispute is merely symptomatic of broader and much more profound differences in our understanding of the so-called "availability requirement" of the can-and-will test. I therefore write separately to explain my views.

## I.

The meandrous history of this application is hardly a model for case management, with (as the water court itself noted) plenty of blame to go around.[1] Exasperated as that court may have been, however, I believe it erred by granting the opposers' motion for post-trial relief and simply dismissing the application relative to these three subdivisions. While belatedly agreeing that the applicants failed to meet a "threshold" obligation to prove the availability of unappropriated water (and discarding the bulk of its earlier 21–page order permitting further observation) may have seemed like a particularly antiseptic way of ending these tangled proceedings, once and for all, I believe it amounted to a fundamental error of law, which deprived the applicants of their statutory right to amend their plan.

Although the applicants argued at trial that their proposed wells would not interfere with existing wells in these subdivisions, and that their plan to augment the stream with an amount of water equal to the amount they would take (even though it would be down-gradient of these particular wells) was therefore sufficient to prevent injury to senior appropriators, the water court remained unconvinced.[2] The court was equally unconvinced, however, by the opposers' expert testimony to the contrary. In its original order, it therefore retained jurisdiction for five years and ordered a four-year supervisory plan to determine whether there would actually be well-to-well interference.

In their motion for post-trial relief, the opposers objected, not simply that this was an improper use of the court's "retained jurisdiction," but that in order to avoid dismissal the applicants were obliged to prove, as a threshold matter, that their proposed drilling

1. "In fairness, the court cannot impose the severe sanction of dismissal, where the court itself has created nearly as much delay as the Applicants." Water Court Order, dated August 4, 2006 (chastising applicants for delay in reducing the court's previous order to a proposed decree and for adding terms and conditions without the court's permission). Unlike the majority, I do not consider this admission merely an expression of the water court's regret that it failed to accept the opposers' "threshold" theory sooner. *See* Maj. op. at 690–91.

2. The majority makes much of the testimony of the applicants' expert, Mr. Wells. During Buffalo Park's case in chief, Wells attempted to testify generally about geological conditions underlying all five of the affected subdivisions but was largely precluded from doing so on the grounds that the report he disclosed in discovery specifically addressed only two of the five. When the trial reconvened after a two and one-half year delay, Buffalo Park's case in chief was reopened only with regard to the Colorado Water Conservancy Board issue for which the delay was granted, and therefore Wells' testimony upon reconvening was limited to general rebuttal of the opposers' expert, concerning falling water levels. While I do not consider this the significant issue on appeal, I am hard pressed to think of another area of the law in which this court would so readily defer to the exclusion of essential expert testimony for a lack of specificity in disclosure, despite virtually endless opportunities for opposing counsel to prepare during the inordinately long subsequent delay in the trial. *See, e.g., Todd v. Bear Valley Village Apartments,* 980 P.2d 973, 980 (Colo. 1999) (failure to disclose considered harmless where trial was continued for other reasons anyway).

would not cause the static water table to drop, which their expert equated with proving the availability of unappropriated water. The applicants opposed the motion, and in their response in opposition asserted that even if retaining jurisdiction for further monitoring were erroneous, dismissal would nevertheless not be the proper remedy. The applicants expressly asserted that upon any determination by the water court that their augmentation plan would not satisfactorily prevent injurious effects to senior appropriators, section 37–92–305(3) of the revised statutes mandated that they be afforded an opportunity to propose additional terms and conditions.

In granting the motion for post-trial relief, the water court ordered dismissal of the applicants' ground water claims regarding these three subdivisions; ordered the applicants to prepare an amended proposed decree, excluding all references to these three subdivisions; and specified that it would entertain motions to reconsider only with regard to "clerical errors, inconsistencies, ambiguities, and omissions," but not with regard to any challenges to its findings of fact or conclusions of law, which challenges it ordered the parties to reserve for appeal. Because the water court expressed its ruling regarding these three subdivisions in terms of a failure to prove the availability of unappropriated water as a threshold matter, it failed to address the applicants' augmentation plan altogether, much less afford them an opportunity to modify it.

## II.

By judicial gloss, this court has previously construed the statutory can-and-will test for a conditional water right, *see* § 37–92–305(9)(b), C.R.S. (2007), to require a demonstration of the availability of unappropriated water. *See Farmers Reservoir & Irrigation Co. v. Consol. Mut. Water Co.*, 33 P.3d 799, 806–07 (Colo.2001). We have never suggested, however, that availability must be established before or apart from consideration of a statutorily permitted augmentation plan with which the application is combined. Quite the contrary, water may be, and typically is, made available and injury avoided through a

plan to provide an augmented water supply sufficient to offset the out-of-priority depletions for which the conditional decree is sought. *See id.; see, e.g., Mount Emmons Mining Co. v. Town of Crested Butte*, 40 P.3d 1255, 1260 (Colo.2002) ("Typically, to satisfy the 'can and will' test, new appropriators must convince the water court that their diversion will cause no harm to senior appropriators: i.e., that water is available."). At least where an application for conditional water rights is accompanied by a plan for augmentation (which would appear to be virtually always, in the current environment), the questions of availability and the adequacy of an augmented water supply are therefore integrally related, if not precisely identical.

The General Assembly dictates that a plan for augmentation must be approved unless it will "injuriously affect" senior water rights, § 37–92–305(3), C.R.S. (2007); and even if it is determined that an augmentation plan, as presented in the application and proposed decree, would cause such injurious effects, the applicant must be afforded an opportunity to propose additional terms or conditions to prevent that injury. *Id.* It is undisputed that the applicants in this case combined their application for conditional water rights with an application for approval of an augmentation plan, to include various changes in water rights, exchanges, and substitutions, proposing to replace from other sources fully 100% of the water they sought to divert.

If an augmentation plan were treated as a thing distinct from, rather than part and parcel of, an application for a conditional decree with which it is combined, the "injurious effect" referred to in the statute might conceivably be construed as including only those particular injuries caused by augmenting the water supply (or by some other aspect of the augmentation plan itself), as distinguished from out-of-priority depletions left unabated by adequate augmentation. In fact, however, without making the distinction express, we have long treated both kinds of injuries—those caused by redirecting water for use in an augmentation plan and those that would result from an application seeking inadequately augmented out-of-priority diversions—as falling within the contemplation

of section 37–92–305(3). *See, e.g., Danielson v. Castle Meadows, Inc.*, 791 P.2d 1106, 1115 (Colo.1990) ("The proponent of a plan for augmentation has the burden to establish the absence of injury *resulting from the out-of-priority diversion of water.*")(emphasis added); *Cache LaPoudre Water Users Ass'n v. Glacier View Meadows*, 191 Colo. 53, 61–62, 550 P.2d 288, 293–94 (1976) (referring to a plan for drilling domestic wells and replacing consumed water with applicant's reservoir rights as an "application for approval of a plan of augmentation," and approving the plan in the absence of injury caused to downstream objectors by depletions from the proposed wells).

That being the case, it is difficult to imagine how an application paired with an augmentation plan, inadequate as that plan may turn out to be, could ever be dismissed for failure to prove the availability of unappropriated water, without first considering the applicant's augmentation plan and, if necessary, permitting the applicant to propose additional conditions that could prevent injury to senior appropriators. While other kinds of injuries can undoubtedly result from inadequate augmentation plans, depriving senior appropriators of water to which they are entitled by reason of their seniority is clearly one such injury. Successfully preventing injury to senior appropriators that would otherwise be caused by out-of-priority depletions, whether accomplished by augmenting the water supply, or perhaps in some other way altogether, is therefore tantamount to making water available for appropriation.

With regard to ground water, the questions of availability and injury are even less differentiable. Perhaps for reasons related to collection and replenishment, we have never attempted to define the "availability" of tributary ground water (as distinguished from surface water) strictly in terms of amount and location. Instead, we have always analyzed the *availability* of groundwater in terms of the *absence of injury* that would result to senior rights from accessing and removing it. *See, e.g., Cache LaPoudre Water Users Assoc.*, 191 Colo. at 62, 550 P.2d at 294 ("We rule that, in a matter such as this one, water is available for appropriation if the taking thereof does not cause injury."); *Fundingsland v. Colorado Ground Water Comm'n*, 171 Colo. 487, 497, 468 P.2d 835, 839–40 (1970) (finding unavailability not simply because underground water was already being mined but only because the proposed appropriation would also result in unreasonable harm). While lowering the static water table in a particular aquifer may injure existing well owners (immediately or at least at some point in the future), proof that the water level will be lowered by pumping additional wells (or the failure to prove otherwise) does not, by itself, demonstrate that unappropriated water is *currently* unavailable.[3]

Although I believe our case law is replete with holdings that are irreconcilable with the water court's understanding of a "threshold requirement" to prove the availability of unappropriated water in general, and the maintenance of a static water table in particular, one need look no further than our holding in *In re Application for Water Rights of Turkey Canon Ranch, LLC (Shirola)*, 937 P.2d 739 (Colo.1997). In that compellingly similar case, Turkey Canon was "seeking conditional underground water rights for two wells accompanied by a plan for augmentation to replace surface water depletions occasioned by pumping the two wells," and the owners of certain small capacity domestic wells filed statements of opposition, asserting that Turkey Canon's proposed wells would lower the static water table and thereby diminish the water supply available for their wells. *Id.* at 743. In concluding that only exempt well owners filing for adjudication at the time of their opposition would have

---

**3.** In *Simpson v. Cotton Creek Circles, LLC*, 181 P.3d 252, 258 (Colo.2008), we upheld the validity of rules governing the use of underground water in Division Three, which were promulgated by the state engineer upon express statutory authority to regulate "so as to maintain a sustainable water supply in each aquifer system" in that division, *see* § 37–92–501(4)(a)(I). Although our reliance on the water court's determination of the unavailability of unappropriated water, in finding the rules valid in the first place, may raise legitimate questions about the circularity of our reasoning, we clearly did not suggest that proof that groundwater "mining" is already taking place means that unappropriated water is no longer available.

standing to challenge the proposed new wells, and in fashioning an appropriate remand order, we made clear that a challenge of this kind goes beyond merely holding the applicant to its burden of proving the availability of unappropriated water and, further, that the viability of Turkey Canon's application was not contingent upon proof that its proposed wells would not lower the water levels in existing wells.

Our initial holding—that the exempt well owners acquired standing only upon filing an application for adjudication—necessarily determined that their challenge went beyond merely holding the applicant to its strict burden of proving availability, standing requirements for which would have been satisfied by "any person." *Id.* at 747. By contrast, we characterized the well owners' objection—that the static water table would be lowered by Turkey Canon's proposed wells—as "assert(ing) injury in an augmentation plan proceeding," standing for which required an allegation of injury to a "legally protected interest in a vested water right or a conditional decree." *Id.* at 751–52. The necessary and inescapable implication of this holding is that an applicant's failure to prove that additional pumping will not lower water levels does not equate with a failure to prove the availability of unappropriated water.

In addition, we held that in order to demonstrate the availability of unappropriated water and prevent injury to existing wells, an augmentation plan supporting an underground water application need not even provide an augmented supply of water sufficient to prevent a lowering of the static water table. *Id.* at 754–55. Relying instead on the principle that a senior appropriator is not entitled to command a substantial flow of an underground aquifer solely to facilitate taking the fraction to which he is entitled, we held that even if the augmentation plan in that case were incapable of maintaining the aquifer's existing water level, the applicants would nevertheless be entitled to propose other techniques for preventing injury, including assigning to themselves the costs incurred by senior well owners in reaching a lowered water table. *Id.* Ultimately, we ordered the water court to simply determine whether "Turkey Canon's application for conditional rights, together with a plan for augmentation," would injuriously affect the exempt well owners. *Id.* at 755.

III.

Although I consider the majority's finding of a procedural default to be both unsupported by the record and irreconcilable with the plain language of section 37-92-305(3), I am more concerned that by treating the matter as simply a question of procedure, the majority fails to come to grips with (or even acknowledge) the debate over this difficult relationship between availability and absence of injury, which proved decisive below. I think it is clear, from any fair reading of the record, that the water court dismissed the application, rather than afford the applicants an opportunity to propose additional conditions, precisely because its ruling was premised on the applicants' failure to initially and separately satisfy the can-and-will test—not a failure of their augmentation plan to prevent injurious effects.

The majority's half-hearted reliance on procedural default as a justification is, in my view, simply untenable. In their response to the motion for post-trial relief, the applicants expressly invoked their statutory right to propose additional terms or conditions, if the court should determine that their augmentation was inadequate. The water court not only ordered dismissal of their application without affording them such an opportunity; it actually limited requests for reconsideration of its dismissal order to complaints about various technical errors, and it directed the applicants to reserve for appeal any challenges they might have to its legal conclusions.

Similarly, I disagree with the majority's suggestion that as a result of our holding in *Shirola*, the applicants should have, at some earlier point in the proceedings, introduced evidence of augmentation sufficient to demonstrate non-injury to existing well owners. Until the water court abruptly reversed itself by granting the motion for post-trial relief, the applicants' augmentation plan had not yet been found inadequate and therefore

they had not yet acquired an obligation, or even a right, to propose additional terms.[4] Quite the contrary, the significance of *Shirola* for this case is our recognition that proof of falling water levels does not, in itself, establish either the unavailability of unappropriated water or an obligation to augment the water supply.[5]

While I consider the majority's finding of a procedural default to be unsupported in any event, its persistence in blaming the applicants for not doing more to assert their right hinges to a large extent on its misreading of the water court's final order and judgment. Quite apart from the water court's own written statement that it would refuse to entertain any but perfunctory challenges to its order of dismissal, no reasonable applicant could have understood its finding of unavailability as being contingent upon the absence of more effective augmentation. Contrary to the majority's interpretation, by the time of the water court's post-trial order, it had indisputably come to accept the opposers' argument that proof of availability was a threshold requirement, which could not be satisfied except by demonstrating that the application would not result in lowering the water levels of surrounding wells. In its final order, the water court therefore found it unnecessary to even acknowledge the augmentation plan included in the applicants' filing. It simply found that their failure to prove an absence of well-to-well hydrologic connection amounted to a failure to satisfy the can-and-will test, mandating dismissal of their application.

I believe that by continuing to treat proof of availability in conditional water rights proceedings (at least those combining the application with an augmentation plan) as a requirement separate and apart from proving

the absence of injury to senior appropriators, we will only perpetuate the misunderstandings and misapplication evidenced in this case. With regard to tributary ground water in particular, I believe this kind of mechanical and meaningless distinction risks allowing the very thing we sought to avoid in *Shirola*—command by senior appropriators of a substantial flow of an underground aquifer solely to facilitate taking the fraction to which they are entitled. *Cf. Simpson v. Cotton Creek Circles*, 181 P.3d at 260–61 (explaining why the engineer's rules requiring regulation "so as to maintain a sustainable water supply in each aquifer system," did not conflict with the principle of maximum utilization, under the particular conditions existing in Division Three). For my part, the majority's attempt to justify the dismissal of this application as a procedural default is not only an unfair characterization of the record but, in fact, trivializes the appeal.

The statute itself offers virtually no guidance about the extent or nature of the opportunity that must be afforded an applicant (or opposer) wishing to propose additional terms, and we have thus far had little occasion to consider this question. The water court, no doubt, must retain the discretion to control the proceedings before it, and therefore an applicant cannot have an unlimited right to perpetually propose additional conditions. In this case, however, where numerous stipulations with opposers had already been entered and the state and division engineers had dropped their objections to the augmentation plan; where the trial proceedings were continued on several occasions, once for more than two and one-half years; and where the water court had not only failed to find any injurious effect but had in fact already granted the application, subject only to further

---

4. In reliance on our holding in *City of Aurora v. Simpson*, 105 P.3d 595, 614–16 (Colo.2005), the majority rightly emphasizes that proof of the adequacy of an augmentation plan cannot be postponed for determination later under retained jurisdiction. Maj. op. at 690. I do not understand it to suggest, however, that this proposition affects in any way an applicant's entitlement to provide additional conditions and prove their effectiveness once its original augmentation plan is determined to be inadequate.

5. Because I agree with the majority's conclusion that the homeowners' association met the requirements of associational standing and therefore had standing to the same extent that its members would have had standing to assert injury individually, I find its discussion about holding the applicant to its strict proof unnecessary. I note only that in *Shirola* we roundly rejected the notion that a challenge by exempt well owners, on grounds of lowering the water table, could be characterized as merely a challenge to the availability of unappropriated water.

supervision; its sudden reversal at the time of post-trial motions leaves it far from clear that the applicants were ever given a fair opportunity to fortify their augmentation plan.

## IV.

Although I believe, for the reasons I have given, that the water court was misled by the opposers' argument concerning the availability of underground water, I also believe it clear that the applicants failed to carry their burden of proving that their application and accompanying augmentation plan would not injuriously affect persons entitled to use water under a vested or conditional water right. Unlike the majority, however, I would remand for the water court to determine whether, in these tangled proceedings, the applicants have been afforded a fair opportunity to propose addition terms or conditions and, if not, to afford them that opportunity.

I therefore respectfully dissent.

I am authorized to state Justice EID joins in this dissent.